WESTINGHOUSE ELECTRIC & MFG. CO. v. DAYTON FAN & MOTOR CO.

(Circuit Court, S. D. Ohio, W. D. February 6, 1901.)

No. 5,289.

1. PATENTS—VALIDITY—SECOND PATENT FOR SAME INVENTION.

A patent for a generic invention is not rendered invalid by the prior issuance to the same inventor, but on a later application, of a patent for a specific device for practicing such generic invention, in the nature of an improvement on the device described in the first application, where there is no waiver or abandonment of any of the claims made in either application.

2. SAME—ELECTRIC POWER TRANSMISSION—SPLIT-PHASE MOTORS.

The Tesla patents, No. 511,559, and No. 511,560, relating to electric power transmission by the use of the alternating current, and which describe what is known as the "Split-Phase Motor," and the method of its operation, were not anticipated by any prior invention of the patentee, but mark a distinct advance in the art which involved invention. Claims 1 and 2 of the first patent, and claims 1, 2, and 6 of the second, *held* infringed.

3. SAME—CONTRIBUTORY INFRINGEMENT—PROCESS PATENT.

A defendant must be held guilty of infringement of a process patent where it admits having manufactured for sale and sold machines which necessarily involve such process in their operation; the presumption being that such machines were used by the purchasers, and that defendant intentionally contributed to such use.[1]

4. SAME—SELLING ELEMENT OF PATENTED COMBINATION.

Where a defendant admits having manufactured and sold one element of a patented combination, which is not shown to have any commercial value except as a part of such combination, the inference is that it was sold for such use, and that he is guilty of contributory infringement.

In Equity. Suit for infringement of patents. On final hearing.

Kerr, Page & Cooper, for complainant.
Albert H. Walker, for defendant.

THOMPSON, District Judge. This suit is brought to enjoin the defendant from further infringing letters patent No. 511,559 and No. 511,560, relating to the transmission of electrical power, and to recover damages for past infringements. The defendant denies the infringement charged, and claims that the letters patent are void for want of invention, and because they are for the same invention as letters patent No. 416,193, granted to the same inventor. At the hearing the complainant asked leave to amend the bill by alleging that the defendant has infringed the letters patent by manufacture and sale as well as by use. The prayer of the bill, the denials of the answer, and the evidence, including the admissions of the defendant, cover the case sought to be made by the amendment, and no prejudice,

---

[1] Contributory infringement of patents, see note to Edison Electric Light Co. v. Peninsular Light, Power & Heat Co., 43 C. C. A. 479.

therefore, to the defendant's rights will be caused by its allowance; and for that reason, and because the omission of the amendatory matter from the bill was inadvertent, the leave will be granted.

The infringement complained of relates to claims 1 and 2 of letters patent No. 511,559, and to claims 1, 2, and 6 of letters patent No. 511,560. Claims 1 and 2 of letters patent No. 511,559 read as follows:

"(1) The method of operating motors having independent energizing circuits, as herein set forth, which consists in passing alternating currents through both of the said circuits, and retarding the phase of the current in one circuit to a greater or less extent than in the other. (2) The method of operating motors having independent energizing circuits, as herein set forth, which consists in directing an alternating current from a single source through both circuits of the motor, and varying or modifying the relative resistance or self-induction of the motor circuits and thereby producing in the currents differences of phase, as set forth."

Claims 1, 2, and 6 of letters patent No. 511,560 read as follows:

"(1) The combination with a source of alternating currents, and a circuit from the same, of a motor having independent energizing circuits connected with the said circuit, and means for rendering the magnetic effects due to said energizing circuits of different phase and an armature within the influence of said energizing circuits. (2) The combination with a source of alternating currents, and a circuit from the same, of a motor having independent energizing circuits connected in derivation or multiple arc with the said circuit, the motor or energizing circuits being of different electrical character, whereby the alternating currents therein will have a difference of phase, as set forth." "(6) In an alternating current motor, the combination with the field magnets or cores and independent energizing circuits of different active resistance, and adapted to be connected with the line or transmission circuit, of an armature wound with closed energizing coils or conductors, as set forth."

1. It is urged as a defense that the inventions of the patents in suit are covered by a prior patent issued to the same inventor, to wit, letters patent, No 416,193. The applications for the patents in suit were filed December 8, 1888, and the patents were issued December 26, 1893. The application for the prior patent was filed May 20, 1889, and the patent was issued December 3, 1889. The patents in suit are generic, and representative of a class which includes the prior patent, which is specific and tributary. The inventions of the three patents were conceived by the same inventor,—Nikola Tesla. In the application, upon which the prior patent was issued, he abandoned nothing claimed in the prior and pending applications, upon which the patents in suit were issued. In the specifications of the prior patent he says, referring to the class to which the motor belongs:

"In prior patents and applications I have shown and described various forms of motors of this kind. Among them are motors in which both energizing circuits are electrically alike,—that is to say, both have the same, or approximately the same, electrical resistance and self-induction,—in the operation of which the alternating currents used are primarily of different phase. In others the difference of phase is artificially produced,—as, for instance, in cases where the motor circuits are of different resistance and self-induction, so that the same current divided between them will be retarded in one to a greater extent than in the other, and the requisite phase difference secured in this way. To this latter class generally my present invention relates."

And in the concluding paragraph of the specifications he says:

"I do not claim herein, broadly, the method and means of securing rotation by artificially producing a greater lag of the current in one motor circuit than

in the other, nor the use of poles or cores of different magnetic suscepti-
bility, as these are features which I have specially claimed in other appli-
cations filed by me."

He claims only the specific form of construction, and not the method
or process by which all motors of its class are operated. It is a means
or device for practicing the methods of the patents in suit, which may
be the subject of a separate patent. The means or devices claimed
or described in the patents in suit will not infringe it, and the methods
of the patents in suit may be practiced by other and different means.
It is in the nature of an improvement of the means or devices claimed
in the patents in suit. The status of the patents in suit is defined by
the ruling of the court in the Barb-Wire Patent Case, 143 U. S. 281,
12 Sup. Ct. 443, 36 L. Ed. 154, where the court says:

"In legal effect, this was a prior patent, since the date of the application,
and not the date of the patent, controls in determining the legal effect to be
given to two patents issued at different dates to the same inventor, and the
order in which they are to be considered."

The applications for the three patents were pending at the same
time. None of them were waived or abandoned, and after due con-
sideration they were allowed by the commissioner of patents, and pat-
ents were issued upon them; but the patents in suit were issued last,
although the applications therefor were filed first. Under the circum-
stances, priority of date can have no prejudicial significance among
the three patents. As is well said by Judge Taft in delivering the
opinion of the court in Thomson-Houston Electric Co. v. Ohio Brass
Co., 26 C. C. A. 107, 80 Fed. 724:

"Since the case of O'Reilly v. Morse, 15 How. 61, 121, 123, 14 L. Ed. 601,
it has been well settled that a patent may issue for an improvement on an
earlier invention either to the original inventor or to a stranger. Of course, no
one can use the improvement without right or license to use the fundamental
invention; but, on the other hand, the right to use the original invention does
not confer the right to use the improvement without license from the tribu-
tary inventor. We do not understand this general doctrine to be denied, but
it is said that if, by some chance, the application for the fundamental patent
is delayed in its course through the patent office until a patent on the avowed
improvement has issued, then the patent on the fundamental invention is void.
In cases where the delay in the issuing of the patent for the main invention
cannot be charged to the laches or fraud of the patentee, such a rule would
be a hard one; and, unless it is required by the express words of the statute,
or by the express holding of the supreme court, we should be inclined, if pos-
sible, to avoid declaring it to exist."

And on page 123, 26 C. C. A., and page 728, 80 Fed., he further says:

"Hence it follows from the propositions above quoted from the opinion in
the case of Miller v. Manufacturing Co., 151 U. S. 186, 14 Sup. Ct. 310, 38 L.
Ed. 121, that a patent for a generic invention is not avoided by the fact that
a prior patent has been issued for a distinct improvement on that invention,
provided always that the language of the application for the first patent, and
the circumstances of filing it, are not such as to dedicate the generic invention
to the public."

The defense of double patenting, therefore, cannot be sustained.

2. The Tesla system of electrical power transmission is founded on
the use of the alternating current, as distinguished from the direct or
continuous current. The alternating current is regarded as prefer-
able for long-distance transmission. The properties of the alternat-

ing current and the principal elements of the Tesla inventions were known, in a general way, to men learned in the science of electricity, prior to the issue of the Tesla patents of May 1, 1888, but he was the first to successfully apply them to power transmission. In the specifications of letters patent No. 382,280, Tesla himself fairly states the conditions fettering the transmission of electrical power prior to May 1, 1888, and the method adopted by him for bettering these conditions. He says:

"I am aware that it is not new to produce the rotations of a motor by intermittently shifting the poles of one of its elements. This has been done by passing through independent energizing coils on one of the elements the current from a battery or other source of direct or continuous currents, reversing such current by suitable mechanical appliances, so that it is directed through the coils in alternately opposite directions. In such cases, however, the potential of the energizing currents remains the same, their direction only being changed. According to my invention, however. I employ true alternating currents; and my invention consists in the discovery of the mode or method of utilizing such currents. The difference between the two plans and the advantages of mine are obvious. By producing an alternating current, each impulse of which involves a rise and fall of potential, I reproduce in the motor the exact conditions of the generator, and by such currents and the consequent production of resultant poles the progression of the poles will be continuous, and not intermittent. In addition to this, the practical difficulty of interrupting or reversing a current of any considerable strength is such that none of the devices at present could be made to economically or practically effect the transmission of power by reversing in the manner described a continuous or direct current. In so far, then, as the plan of acting upon one element of the motor is concerned, my invention involves the use of an alternating as distinguished from a reversed current, or a current which, while continuous or direct, is shifted from coil to coil by any form of commutator, reverser, or interrupter."

This step in advance of old methods is conceded to be one involving a high degree of invention. But for many of the purposes of power transmission the new or poly-phase system was found objectionable on the score of expense, and then the next step was taken, by Tesla, which resulted in the invention of a method of operating motors which combined the advantages of the poly-phase system with the inexpensiveness of the single-phase method. The new method employed but a single transmission circuit from the generator, but the motor circuits were made to serve all the purposes of the double circuits of the original patents. The distribution of the current from the transmission circuit to the motor circuits is described by Tesla in the specifications of patent No. 511,559 as follows:

"The distribution of current between the two motor circuits may be affected by induction or by derivation. In other words, I may pass the alternating current from the source through one energizing circuit, and induce by such current a second current in the other energizing circuit. Or, on the other hand, I may connect up the two energizing circuits of the motor in derivation or multiple arc with the main circuit from the source."

Both methods are covered broadly by claim 1 of patent No. 511,559 and the way by derivation by claim 2 of that patent. Patent No. 511,560 is for apparatus for carrying out the way by derivation. In order to produce in the motor a rotary field sufficiently effective to give the motor self-starting capacity, it is necessary to create the requisite difference of phase between the motor circuits, which by the

method of the original patents is provided by the generator; and this is done, under the teachings of the patents in suit, by "retarding the phases of the current in one circuit to a greater or less extent than in the other," by varying the resistance, dead or active, in one or both of the circuits, through the introduction of resistance or self-induction coils, or by the construction of the motor with, for example, one set of energizing coils wound with finer wire than the other, and in other ways pointed out in the specifications of patent No. 511,560. Now, it is said that in view of the prior art, including the Tesla patents of May 1, 1888, there was no invention in this last step, but merely the exercise of the skill of the electrician or electrical engineer, because the taking of the first step by Tesla rendered the second step perfectly obvious to any one skilled in the art. But, notwithstanding the state of the prior art, and the "laboratory knowledge" of those skilled in it, no one but Tesla took either of these steps which have added so much to the practical and useful knowledge of the electrical world. In the language of the expert, Main:

"To conceive of the idea of creating a rotary field at the motor end of the circuit, not by sending separate impulses from virtually separate machines, but by dividing the single impulse from a single machine, and then causing these divisions of impulse to react against each other in such a manner as to produce rotation, appears to me to have been an idea of a highly inventive nature."

The retardation of phase by artificial means, and its conversion from an element of disadvantage to one of usefulness, in the transmission of electrical power, must be regarded as evidence of invention. But, as has been so often said, it is difficult to determine where skill ends and invention begins, and in such cases the result must be considered in determining the fact. Here a new and useful result was accomplished, which, in the light of the evidence, cannot be said to have been perfectly obvious; for, although the minds of inventors and those interested in the art had been specially directed to the use of the alternating current as a means for the transmission of power by the patents of May 1, 1888, yet neither the defendant nor any one else took this step in the progress of the art until the way was pointed out by Tesla. Considering the result, whatever doubts there may be as to the fact of invention should be resolved in favor of the patents.

3. It is contended by the defendant that patent No. 511,559, being a process patent, is susceptible of infringement only by use, and that there is no evidence of use by the defendant. But, as shown by the report of the examiner, the defendant, at the taking of the testimony on the 6th day of June, 1899, for the purposes of evidence in the suit, through its counsel, admitted—

"That 'Complainant's Exhibit Defendant's Motor' was made and sold by the defendant within the last few months, and that the defendant did, in the Southern district of Ohio, and elsewhere in the United States, sell many such motors before, and also after, the filing of the bill of complaint in this case; and both before and after filing the bill of complaint in this case, and within six years before the filing of the bill of complaint, the defendant did manufacture many such motors in its factory in Dayton, Ohio, for sale and use throughout the United States."

There is no denial of the allegations of the bill charging the defendant with knowledge of both of the letters patent in suit, and the motor in evidence embodies the inventions claimed and described in letters patent No. 511,559; and the admissions, therefore, of the defendant, in the absence of evidence to the contrary, are sufficient proof not only that such motors were made and sold by the defendant, but that they were used by the purchasers thereof, and that the defendant intentionally contributed to the use, in disregard of the rights of the complainant.

The defendant further contends that claims 1 and 2, respectively, of letters patent No. 511,560, "call for a combination of a dynamo, and a circuit from the same, and a motor," and that there is no evidence that the defendant ever made, used, or sold either of the first two elements of the combination, and therefore no evidence that the defendant ever made, used, or sold the subject of these claims, and that the charge of infringement, based on these claims, must necessarily fail. But the admissions of the defendant show that the defendant did make and sell for use the motor of the combination, and, it may fairly be inferred, for use in the combination. There is no evidence to show that it could have any commercial value for any other purpose, and in view of the admissions of the defendant, and the absence of any showing whatever to the contrary, it must be regarded as an established fact that it was sold for the purposes of this combination, bringing it within the ruling of Thomson-Houston Electric Co. v. Ohio Brass Co., 26 C. C. A. 107, 80 Fed. 712, where it is held that:

"One who makes and sells one element of a patented combination, with the intention and for the purpose of bringing about its use in such a combination, is guilty of contributory infringement, and is equally liable with him who in fact organizes the complete combination."

Nor is the contention of the defendant that the evidence fails to show that its motor contained "independent energizing circuits of different active resistances" well founded, and upon the evidence, and under well-established rules of law, the armature of the defendant's motor must be regarded as the equivalent of the one described in claim 6 of patent No. 511,560, performing its functions, and in substantially the same way; and it follows that the charge of infringement made in the bill must be sustained. There will be a decree, therefore, for the complainant, in accordance with the prayer of the bill.