CENTURY ELECTRIC CO. v. WESTINGHOUSE ELECTRIC & MFG. CO.†

(Circuit Court of Appeals, Eighth Circuit. November 3, 1911.)

No. 3,324.

*(Syllabus by the Court.)*

1. PATENTS (§ 66\*)—ANTICIPATION—APPLICATIONS PENDING TOGETHER.

Where each of several applications, which subsequently ripen into patents to the same inventor, describes the same machine and process and the inventions claimed in all the applications, but no one of the applications claims any invention claimed in any of the others, and they are all pending at the same time, the respective dates of the applications and of the patents and the respective dates when the applications were filed are immaterial, and .the applications and patents cannot be used to anticipate or avoid each other.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 79, 81; Dec. Dig. § 66.\*]

2. PATENTS (§ 66\*)—ANTICIPATION—PRIOR PATENTS—IDENTITY OF INVENTION.

While an earlier patent avoids a later patent to the same patentee for the invention claimed and secured by the former, it does not invalidate a later patent to him for a distinct different invention not claimed and secured by the earlier patent, whether that invention is general or specific, is of a process or of a machine, or of both, and whether it is of an original machine or process, or of an improvement thereon.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 79, 81; Dec. Dig. § 66.\*]

3. PATENTS (§ 119\*)—INVENTION—NUMBER OF PATENTS PROCURABLE.

One who makes several patentable inventions that produce a new and useful process or machine, or both, pertaining to the same subject-matter, has the option to take one patent therefor or as many separate patents therefor as he makes patentable inventions.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 171; Dec. Dig. § 119.\*]

4. PATENTS (§ 157\*)—CONSTRUCTION—NATURE OF PATENT—"CONTRACT."

A patent is a contract, and it must be interpreted by the same rules of construction as other contracts.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 229; Dec. Dig. § 157.\*

For other definitions, see Words and Phrases, vol. 2, pp. 1513–1534; vol. 8, pp. 7615–7616.]

5. PATENTS (§§ 157, 160\*)—CONSTRUCTION—SPECIFICATIONS AND CLAIMS—CONSTRUCTION AS A WHOLE.

The intention of the parties should be deduced from the entire contract, not from any part of it, or without any part of it.

The specification which is a part of the same application and specifcation as are the claims must be read and interpreted with them, not for the purpose of contracting or of expanding the latter, but to ascertain from the entire agreement the actual intention of the parties, and that intention when ascertained should prevail.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 232, 235; Dec. Dig. §§ 157, 160.\*]

6. PATENTS (§ 7\*)—INVENTION—PROCESS AND APPARATUS.

Separate patents for a new and useful process and for a new and useful apparatus to practice it may be sustained, although no other apparatus to practice it is known.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 6; Dec. Dig. § 7.\*]

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied February 7, 1912.

**7. Patents (§ 328*)—Anticipation—Particular Patents.**

Patent No. 555,190 to Tesla, for a combination or apparatus to practice the process secured to Tesla by patent No. 511,915, is not anticipated or avoided by the latter.

Patents Nos. 555,190 and 511,915 are not for the same invention as patent No. 445,207 to Tesla, and neither of them is anticipated or avoided thereby.

**8. Patents (§§ 312, 112*)—Infringement—Presumptions—Decision of Patent Office.**

It is a general rule that there is a legal presumption that a process or apparatus of a later patent does not infringe upon that of an earlier patent relating to the same subject.

It is a general rule that a process or apparatus of a later patent does not infringe the process or apparatus of an earlier patent where the Commissioner has decided there was no interference between them.

There is an exception to this rule to the effect that where a patentee has made a primary invention of a new or useful process or apparatus which accomplishes a result never before produced by such a process or machine, the presumption that a process or apparatus of a later patent on the same subject is for a subordinate improvement or modification of the primary invention and hence subject to an infringement of the patent which secures it, is at least as strong as the presumption of the general rules, because there are many more patents for subordinate improvements and modifications of primary inventions than there are for such inventions, and hence more probability that a given process or apparatus is of the former than that it is of the latter class.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 544, 162–165; Dec. Dig. §§ 312, 112.*]

**9. Patents (§ 283*)—Infringement—Defenses.**

It is no defense to a charge of infringement of a process, an apparatus or a combination clearly described and claimed in a patent that it, or some part of it, was misnamed therein by the patentee, or that the infringer has called it by a different name. Patents protect processes, apparatus, and combinations, whatever their names.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 448–452; Dec. Dig. § 283.*]

**10. Patents (§ 328*)—Infringement—Particular Patents.**

Claim 1 of patent No. 511,559, claim 1 of patent No. 511,915, and claims 1, 2, and 6 of patent No. 555,190 to Nikola Tesla, regarding electrical transmission of power, are valid, and the defendant's device which it claims follows the combinations secured by patent No. 399,801 to Thomson & Wightman and patent No. 428,650 to Thomson, is an infringement thereof.

Appeal from the Circuit Court of the United States for the Eastern District of Missouri.

In Equity. Bill by the Westinghouse Electric & Manufacturing Company, against the Century Electric Company. From a decree for complainant, defendant appeals. Affirmed.

Thomas F. Sheridan (Roy M. Eilers, on the brief), for appellant.
Parker W. Page and Thomas B. Kerr (Paul Bakewell, on the brief), for appellee.

Before SANBORN and VAN DEVANTER, Circuit Judges, and REED, District Judge.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

SANBORN, Circuit Judge. This is an appeal from a decree for an injunction against the infringement by the Century Electric Company, a corporation, the defendant below, of claim 1 of letters patent No. 511,559 to Nikola Tesla, issued December 26, 1893, on an application filed December 8, 1888, claim 1 of letters patent No. 511,915 to Nikola Tesla issued January 2, 1894, on an application filed December 3, 1888, on a division of an application filed May 15, 1888, and claims 1, 2, and 6 of letters patent No. 555,190 to Nikola Tesla issued February 25, 1896, on an application filed May 15, 1888. The contentions on which counsel for the defendant below rely for a reversal of this decree are (1) that patents Nos. 511,915 and 555,190 are void because they secure the same inventions as patent No. 445,-207, issued to Nikola Tesla January 27, 1891, on an application filed May 20, 1889, (2) that patent No. 555,190 is void because it is for the same invention as patent No. 511,915, and (3) that the defendant did not infringe any of the claims specified in the decree.

[1, 7] 1. Where each of several applications which subsequently ripen into patents to the same inventor describes the same machine and process and the inventions claimed in all the applications, but no one of the applications claims any invention claimed in any of the others and they are all pending at the same time, the respective dates of the applications and of the patents and the respective dates when the applications were filed are immaterial, and the applications and patents cannot be used to anticipate or avoid each other. Ide v. Trorlicht, Duncker & Renard Carpet Co., 115 Fed. 137, 145, 53 C. C. A. 341, 349; Walker on Patents, § 180; Suffolk Mfg. Co. v. Hayden, 3 Wall. 315, 318, 18 L. Ed. 76; Westinghouse Elec. & Mfg. Co. v. Dayton Fan & Motor Co. (C. C.) 106 Fed. 724, 726; Graham v. McCormick (C. C.) 11 Fed. 859; Graham v. Manufacturing Co. (C. C.) 11 Fed. 138, 141. The applications for patents Nos. 511,915 and 555,190 were filed more than a year before the application for patent No. 445,207 was filed. They were pending during all the time that application was pending, but on account of delays from interference did not ripen into patents until long after the patent upon that application had issued. This fact, however, in no way countervails the validity of these patents unless Tesla in his application for patent No. 445,207 claimed the same invention which he claimed in his applications for patents Nos. 511,915 and 555,190.

An inventor, it is true, may not sustain a subsequent patent for an invention actually claimed and secured in a former patent. Miller v. Eagle Co., 151 U. S. 186, 197, 14 Sup. Ct. 310, 38 L. Ed. 121; Mosler Safe Co. v. Mosler, 127 U. S. 355, 361, 362, 8 Sup. Ct. 1148, 32 L. Ed. 182; Otis Elevator Co. v. Portland Co., 127 Fed. 557, 561, 562, 62 C. C. A. 339, 343, 344; Western Electric Co. v. Williams-Abbott Elec. Co., 108 Fed. 952, 955, 48 C. C. A. 159, 162; Thomson-Houston Elec. Co. v. Hoosick Ry. Co., 82 Fed. 461, 467, 468, 27 C. C. A. 419, 425, 426. Nor may he sustain a subsequent patent for an essential element of an invention secured by a former patent without which that invention would not have been patentable. Palmer Pneumatic Tire Co. v. Lozier, 90 Fed. 732, 740, 742, 744, 745, 33 C. C. A.

255, 263, 265, 267; Industrial Mfg. Co. v. Wilcox & Gibbs Sewing Machine Co., 112 Fed. 535, 537, 50 C. C. A. 387, 389.

[3] But one who makes several patentable inventions that result in a new and useful machine or process, or both, may have as many separate valid patents as he makes patentable inventions. His is the option to secure all these inventions by a single patent, or by many patents, and the fact that he describes all of them in his application or specification for an earlier patent to secure one or more of them, does not invalidate a subsequent patent to him for those inventions there described but not claimed. Robinson on Patents, § 465; Expanded Metal Co. v. Bradford, 214 U. S. 366, 383, 385, 29 Sup. Ct. 652, 53 L. Ed. 1034; Badische Anilin & Soda Fabrik v. A. Klipstein & Co. (C. C.) 125 Fed. 543, 544; Westinghouse Elec. Co. v. Dayton Fan & Motor Co. (C. C.) 106 Fed. 724, 726; Westinghouse Elec. & Mfg. Co. v. Electric Appliance Co. (C. C.) 142 Fed. 545, 551.

[2] And a patent for an invention does not avoid a later patent for an improvement thereon nor does a patent for an improvement avoid a later patent for the invention on which the improvement is made. Thomson-Houston Elec. Co. v. Ohio Brass Co., 80 Fed. 712, 724, 725, 726, 26 C. C. A. 107, 119, 120, 121. The sum of the whole matter is that while an earlier patent avoids a later patent to the same patentee for the invention claimed and secured by the former it does not invalidate a later patent to him for a distinct, different and separable invention whether generic or specific, whether an original machine or process, or both, or an improvement thereon which is not actually claimed or secured by the earlier patent. Thomson-Houston Elec. Co. v. Elmira & H. Ry. Co., 71 Fed. 396, 405, 18 C. C. A. 145, 154; Electrical Accumulator Co. v. Brush Electric Co., 52 Fed. 130, 138, 139, 2 C. C. A. 682, 690, 691.

The first question in this case therefore is, Did Tesla in his application for patent No. 445,207, which was filed after his applications for patents Nos. 511,915 and 555,190 were filed, and which ripened into a patent while they were pending, claim the same invention which he claimed in those applications and secured by the patents thereon? Claim 1 of patent No. 511,915 reads:

"The method of operating electro-magnetic motors having independent energizing circuits, as herein described, which consists in passing an alternating current through one of the energizing circuits and inducing by such current the current in the other energizing circuit of the motor, as set forth."

Claims 1, 2, and 6 of patent No. 555,190 read in this way:

"1. In an electro-magnetic motor, the combination of independent energizing circuits, one adapted to be connected with a source of alternating current, the other arranged in inductive relation to the said first circuit whereby the motor will be operated by the resultant action of the two circuits, as set forth.

"2. The combination in an electro-magnetic motor, with an alternating coil or conductor and a closed-circuit conductor in inductive relation thereto, of an armature mounted so as to be within the field produced by the coil and closed conductor, as set forth."

"6. In an electro-magnetic motor the combination of independent energizing-circuits, one for connection with a source of alternating currents, the other in inductive relation to the first, whereby a rotary movement or projection

of the field-poles will be produced by the conjoint action of the two and an armature mounted within the influence of the field produced by the energizing circuits and containing closed coils or circuits, as set forth."

Claims 1, 2, and 3 of patent No. 445,207 read thus:

"1. The combination, in a motor, of a primary energizing-circuit adapted to be connected with the circuit of a generator and a secondary energizing-circuit in inductive relation thereto, the two circuits being of different electrical character or resistance, as set forth.

"2. The combination, in a motor, of a primary energizing-circuit adapted to be connected with the circuit of a generator and a secondary energizing-circuit in inductive relation thereto, the two circuits being of different self-induction, as herein set forth.

"3. The combination, in a motor, of primary energizing-coils adapted to be connected to a source of current and secondary energizing-coils in a circuit in inductive relation thereto, one set of said coils being formed by conductors of small size and few turns, the other by conductors of larger size, as set forth."

[4] A patent is a contract made by the acceptance by the government of the offer which the patentee by his application makes to disclose his invention, in consideration that the United States will secure to him the exclusive use and sale of it for 17 years. The offer embodied in the application becomes the specification of his patent, if his offer is accepted, and with his claims evidences the terms of the agreement. Such an agreement is interpreted by the same rules that determine the construction of other contracts. The court should, as far as possible, place itself in the situation of the parties when they made their agreement and then seek to ascertain from the terms of their contract, in the light of the circumstances then surrounding them, what their intention was.

[5] This intention should be deduced from the entire contract and not from any part of it or without any part of it, because they did not agree to it, or to any part of it, without every other part of it. The specification which forms a part of the same application as the claims must be read and interpreted with them, not for the purpose of limiting, or of contracting, or of expanding, the latter, but for the purpose of ascertaining from the entire agreement, of which each is a part, the actual intention of the parties and that intention when ascertained should prevail over the dry words and inapt expressions of the contract evidenced by the patent, its specification and claims. Seymour v. Osborne, 11 Wall. 516, 547, 20 L. Ed. 33; National Hollow Brake-Beam Co. v. Interchangeable Brake-Beam Co., 106 Fed. 693, 701, 45 C. C. A. 544, 552; O. H. Jewell Filter Co. v. Jackson, 140 Fed. 340, 344, 72 C. C. A. 304, 308; Louden Machinery Co. v. Janesville Hay Tool Co., 148 Fed. 686, 690, 78 C. C. A. 548, 552; Electric Machine Co. v. Morris (C. C.) 156 Fed. 972, 974; Lewis Blind Stitch Machine Co. v. Premium Mfg. Co., 163 Fed. 950, 955, 90 C. C. A. 310, 315; Fullerton Walnut Growers' Ass'n v. Anderson-Barngrover Mfg. Co., 166 Fed. 443, 461, 92 C. C. A. 295. Let us apply these rules to the interpretation of the applications for these patents. When, on May 15, 1888, the applications for patents Nos. 511,915 and 555,-190 were filed, Tesla had discovered and secured by earlier patents a system and apparatus for the transmission of electrical power by the

use of alternating currents of electricity. Familiar with the fact that an alternating current flowing in one direction gradually waxes in strength from zero to its maximum, then wanes to zero, waxes to its maximum in the opposite direction, wanes to zero and repeats this course of action, and that the rapidity of these changes is such that when such a current is transmitted to a motor its effect is to give the armature alternate impulses, first in one direction and then in another, in such rapid succession that it will not start, he had discovered and secured by patents a system and means of starting such motors by transmitting to them through two or more independent energizing-circuits from a generator having corresponding current generating, or induced circuits, alternating currents which differed in phase, that is to say, in the times when they reached their respective maxima strengths in either direction, for example, two currents, one of which would reach its maximum in one direction when the other lagged 90 degrees, was at zero and just commencing to flow in the same direction while the former was commencing to wane. It was, however, indispensable to the operation of this system, that there should be provided for each alternating current a separate current generating or induced circuit developing a current differing in phase from every other current generated thereby and that each of these currents should be carried to the motor over separate conductors. These separate generating or induced circuits and conductors were expensive and the object of the inventions described and claimed in patents Nos. 511,915 and 555,190 was to provide a method and apparatus for starting and rotating the armature of a motor by the use of a single alternating current conducted from the generator to the motor over a single circuit from a single original source. In his applications for these patents Tesla recited that in former patents granted to him, notably in patents Nos. 381,968 and 382,280, he had shown and described the system of transmitting power by means of alternating currents which has been mentioned, that his new inventions pertained to this system and that their novel feature was a process and mechanical means of practicing the process of generating in two motor circuits the alternating currents necessary to operate the motor by directly generating an alternating current in but one of those circuits and inducing the necessary current differing in phase in the other. He called attention to the fact that when two independent currents were produced in the magneto machine a corresponding number of line or transmitting circuits would of necessity extend the entire distance from the generator to the motor, but that by the use of his new process and apparatus all line or transmitting circuits but one could be dispensed with because that circuit could be brought into inductive relation with the other in the motor itself. He then described a means of securing this result in these words:

"I employ as a motor, for example, a subdivided annular field magnet within which is mounted a suitable armature, as a cylinder or disk, wound with two coils at right angles, each of which forms a closed circuit. On the opposite sides of the annular field magnet I wind two coils of insulated wire of a size adapted to carry the current from the generator. Over these coils or close to them, in any of the well-understood ways, I wind secondary coils. I

also wind on the annular field magnet midway between the first-mentioned coils a pair of coils which I connect up in circuit with the secondary coils. The last pair of coils I make of finer wire than the main or line and secondary coils and with a greater number of convolutions, that they may have a greater relative magnetizing effect than either of the others. By connecting up the main coils in circuit with a generator of alternating currents, the armature of the motor will be rotated. I have assumed that this action is explained by the following theory: A current impulse on the line passing through the main coils establishes the magnetic poles of the annular field magnet at points midway between said coils; but this impulse produces in the secondary coils a current differing in phase from the first which circulating through the second pair of energizing coils tends to establish the poles at ninety degrees removed from their first position, with the result of producing a movement or shifting of the poles in obedience to the combined magnetizing effect of the two sets of coils. This shifting continued by each successive current impulse establishes, what may be termed, a rotary effort and operates to maintain the armature in rotation."

He then describes in detail, by reference to diagrams which form part of each of his applications, his method and means of producing the result he sought, shows how a stronger and better rotary effect may be obtained from a single line circuit by increasing the number of circuits in which currents are induced, declares in his application for patent No. 555,190 his belief, which has proved to be well founded, that he was the first to produce "any kind of a motor adapted to be operated by alternating currents and characterized by any arrangement of independent circuits brought into inductive relation so as to produce a rotary effect or effect due to the conjoint action of alternating currents from a source of supply in one of the motor circuits and alternating currents induced by the first-named currents in the other circuit, and this without reference to the specific character or arrangement of the said two circuits in the motor," gives notice that the application of the principle of his invention there claimed is not limited to the specific forms of motors shown therein, that his invention is not limited to the specific means shown therein for inducing in one energizing circuit of the motor the currents necessary for cooperating with the primary current of the generator to produce the progressive shifting of the poles or points of maximum effect and then makes his claims for the apparatus he invented, the first of which has been already recited.

In his application for patent No. 511,915, after describing his former method of driving a motor by transmitting through it alternating currents differing in phase by means of separate transmitting circuits, his new inventions and the object he sought to attain thereby in substantially the same way and by the use of the same diagrams as in his application for patent No. 555,190, he declares that the application of the principle of the invention he claims is not limited to the special form of motors he has shown, that his method of producing the currents in the independent energizing circuits of the motor may be carried out in various ways, and that it is not material to the invention, broadly considered, what devices are employed in effecting the result, viz., the induction from or by the current from the generator or source, of the current or currents which co-operate therewith in producing the rotation of the motor. Then he makes his

claims for the process, the first of which is here in suit and has been set forth above. This review of these two applications discloses the fact that they were the applications of a pioneer in the art who had discovered a new process and a new apparatus for rotating a motor by the use of a primary alternating current conducted from the generator or source to the motor over a single line circuit and by the induction in the motor from or by that current of the necessary currents differing from it in phase to cause the rotation, for two patents, one for his process and one for the mechanical device by which he attained the object he sought.

These two applications took effect from May 15, 1888, for they sprung by division from an original application filed on that day. By them Tesla had offered the novel process and apparatus which has been described and had applied for patents for them and the United States was considering whether or not it would accept these offers when, on May 20, 1889, Tesla filed his application for patent No. 445,207. He opens that application with the statement that he has invented and described in other applications the apparatus which is described in the applications for patents Nos. 511,915 and 555,190 whereby a motor may be operated by an alternating current conducted from its source to the motor over a single line circuit and by an alternating current or currents induced in the motor by or from the primary current. He follows this statement with the declaration that the object of his present invention is to render this form of motor more efficient and to improve its action or mode of operation, and closes the part of it which precedes the claims, with these words:

"I do not claim broadly herein the method of operating motors by inducing in one circuit currents by means of those in another, nor the other features herein not specifically pointed out in the claims, having personally filed applications for such features."

In the body of the specification he states that the operation of these motors is dependent upon a certain difference in phase between the primary and secondary currents, and that the specific object of the improvement he describes is to obtain a difference of phase or lag that is suited to working conditions. After an explanation of the principle of his improvement that it is unnecessary to quote here, he writes:

"To secure a proper difference in phase between the primary and secondary currents themselves, I increase the resistance of the circuit of the secondary and reduce as much as possible its self-induction. I do this by using for the secondary circuit, particularly in the coils 'E', wire of comparatively small diameter and having but few turns around the core; or I use some conductor of higher specific resistance, such as German silver, or I may introduce at some points in the secondary circuit an artificial resistance 'T'. Thus the self-induction of the secondary is kept down and its resistance increased with the result of decreasing the lag between the electro-motive force and the current in the primary coils and increasing the difference of phase between the primary and secondary circuits."

Another method of increasing this difference of phase, which he suggests, is the introduction in the circuit that includes the secondary coils, of a self-induction coil and the insertion of a dead resistance in

the primary circuit from the generator. In the course of his statement in detail of the devices he had discovered to increase this difference in phase and of the operation of those devices, he described the apparatus and the process he had previously described and claimed in his applications for patents Nos. 511,915 and 555,190, but he distinctly stated that the subject of this, his later application, was the improvement of that process and apparatus and the only improvements he set forth were the phase-regulating devices that have been described.

A primary alternating current produced by a generator and a secondary alternating current induced from or by the former ordinarily differ in phase. The difference that is most effective in the production of rotary motion in the armature of a motor is a difference of 90 degrees. The two currents do not always differ to that extent, and the evident purpose of the inventions Tesla described in his application for patent No. 445,207 was to improve the process and the means for operating a motor by the conjoint use of the primary alternating current and the alternating current induced thereby in the motor by so regulating the difference in their phases that it should be as near as possible to 90 degrees and hence as efficient as possible. Counsel, however, contend that the application for No. 445,207 describes the process and the apparatus described and claimed in Nos. 511,915 and 555,190 and that its claims were broad enough to cover them, and upon these contentions they base their argument that patent No. 445,207 secured them and rendered the later patents void. Conceding their premises, the conclusion they deduce does not follow. Their argument fails to give due weight to the rules that an inventor has the option to take a single patent or separate patents to his separate inventions, that he may sustain a patent to an original or primary invention and another patent to an improvement thereof, that he may describe in an application an invention which he does not claim therein without waiving his right to claim and secure a subsequent patent for it, that patents are contracts and their interpretation is governed by the rules for the construction of agreements, and that the dominant rule for such construction is to ascertain from the entire patents, not from the specifications or claims alone, the intention of the parties when they were made and to give that intention effect. When Tesla filed his application for patent No. 445,207, his applications for his patents for his process and his apparatus for operating a motor by a primary alternating current from a generator and a secondary alternating current induced from or by the primary current, had been on file for more than a year. These are the main inventions for our consideration. Tesla declared in his later application for No. 445,207 that it was to secure a patent for improvements on these inventions. The only improvements that application disclosed were the specific devices for regulating the difference in phase of the primary and secondary currents in order to make that difference more nearly 90 degrees. Those devices were not essential to the inventions of the process and the mechanical device for operating motors by induced alternating currents, and they were not claimed in the applications for

the patents for those inventions. In the later application Tesla expressly disclaimed seeking thereby to secure that process and apparatus and stated his reason to be that he had previously filed applications for them. Conceding that the claims of patent No. 445,207 issued on that application were broad enough if they stood alone to cover the main inventions, they did not stand alone, but were conditioned by the specification which accompanied them. They were for combinations and in the light of that specification the new phase regulating devices specified therein constituted an essential element of each of the combinations there claimed, and did not constitute an indispensable element of the process or of the apparatus described and claimed in the earlier applications. Those new devices were improvements on the main inventions, and patent No. 445,207 was for these improvements in combination with the main inventions, while the earlier applications were for the inventions without these improvements. And the conclusion is irresistible that the parties to these patents never intended that patent No. 445,207 should secure, and that it never did secure, the same invention as either patent No. 511,915 or No. 555,190, and that it did not render the latter patents void. Westinghouse Electric Co. v. Dayton Fan & Motor Co. (C. C.) 106 Fed. 724, 726; Tesla Electric Co. v. Scott (C. C.) 97 Fed. 588, 598.

[6] 2. The second contention of counsel for the defendant is that patents No. 511,915 for the process and No. 555,190 for the apparatus are for the same invention and therefore the latter is void. The rules and principles which have already been stated and applied in the consideration of the validity of these patents in the face of No. 445,207 condition the decision of the question which this contention presents. The claims for these two patents were first made in a single application filed May 15, 1888. At that time there was a clause in rule 41 of the Rules and Practice of the Commissioner of Patents that "claims for a machine and the process, in performance of which the machine is used, must be presented in separate applications," a clause which was held to be unauthorized and void in 1904 in Steinmetz v. Allen, 192 U. S. 543, 563, 24 Sup. Ct. 416, 48 L. Ed. 555. Under that clause the Commissioner required Tesla to divide his application, to present his claims for his process and his claims for his apparatus in separate applications. He complied with this requirement and these patents issued on the separate applications. There can be no doubt, therefore, that at the time the contracts, evidenced by those patents, were made the parties to them believed that they were for distinct and separate inventions and intended that patents for them as such should issue. But counsel argue that notwithstanding this fact the patented process cannot be used without the patented apparatus, nor the patented apparatus without the patented process, and from this fact they deduce the conclusion that they are for the same invention. The deduction does not seem to be warranted. Section 4886, Rev. Stat. (U. S. Comp. St. 1901, p. 3382). declares that any person who "has invented or discovered any new or useful art, machine, manufacture or composition of matter" may have a patent therefor. If one discov-

ers an art or process, and invents a machine to practice it, does he deprive himself of his right to a patent for his process by securing a patent for his machine? The statute answers this question in the negative. It provides that any person who has invented a new and useful machine may obtain a patent for it and it does not except one who has also patented a process in the practice of which·his machine will be useful. As Congress made no such exception, the courts may not do so. Armour Packing Co. v. United States, 82 C. C. A. 135, 152, 155, 153 Fed. 1, 18, 21, 14 L. R. A. (N. S.) 400.

Moreover, it is as probable that an apparatus will be invented which is not the mechanical equivalent of that patented, by means of which the patented process may be practiced as it was before the event that the patented process would be discovered and the patented machine invented. And the patentee is entitled to the protection of his process against its use by such a subsequently invented machine, and also to protection of his apparatus against its infringement by its mechanical equivalents. Hence· the patents for the process and for the machine by which it may be practiced are not for the same invention and neither was rendered void by the other.

[10] 3. Does the process or apparatus of the defendant infringe the claims in· suit? Tesla discovered and claimed a process and invented and claimed an apparatus by means of which a motor could be started and rotated by the conjoint use of a single phase alternating current conducted from the generator or source to the motor over a single line circuit and of an alternating current induced in a closed circuit of the motor by the primary current and differing from it in phase. He called both these currents independent energizing currents, and the circuits in which they were produced independent energizing circuits, but the specifications clearly showed, and the fact was, that· the induced current was caused by the primary current, and the circuit in which it was produced was induced to produce it by the current in the primary circuit, so that, considered in their causative relation to each other, these circuits were not independent, but the secondary current and circuit were dependent upon the primary current and circuit. Considered in their relations between themselves exclusively, the primary circuit and current alone were energizing, and the secondary current and circuit were energized therefrom or thereby, but when considered in their relation to the motor they were both energizing circuits and currents, because the secondary circuit and its current differing in phase from the primary current and circuit were as indispensable as the latter to the starting and rotation of the motor. They were independent only in the sense that they differed in phase and that this essential difference of phase inhered in and was preserved by them. They were energizing only in the sense that each was essential to start and drive the motor, and not in the sense that the secondary was not energized by or from the primary. And these facts appeared clearly and without doubt upon the face of the applications for the patents and the specifications thereof.

In his specifications for patents Nos. 511,915 and 555,190, and in the diagrams which formed a part of them, Tesla described two forms

of motors, one in which an armature is mounted within the annular field magnet upon which the requisite coils of wire are properly wound, as heretofore described, and one in which the internal face of the annular field magnet is provided with three pairs of polar projections, upon the first set of which the main energizing coils, and over them induced coils, are wound, upon the second set of which the second energizing coils, which are connected in circuit with the first induced coils, and over them the second induced coils, are wound and upon the third set of which the tertiary energizing coils in circuit with the second induced coils are wound. He shows within this annular field magnet a cylindrical-disk armature core with three sets of projections on its periphery wound with coils forming closed circuits. He explains in his specifications that the alternating current conducted from its source to the first set of energizing coils will magnetize the first pair of pole pieces on the field magnet, will induce an energizing current in the second set of energizing coils, and that this second set will induce an energizing current in the third set of energizing coils, but that these three currents will differ in phase, will cause the progressive shifting of the poles or points of maximum effect, will start and rotate the armature, and that his invention is not limited to this or any form of motor nor to the specific means he shows for inducing in any energizing circuit of a motor the currents necessary to co-operate with the primary current to produce the starting and rotation of the armature. Bearing these facts in mind let us turn to the motor of the defendant. It is a ceiling fan motor consisting of an internal stationary field and an external revolving armature to which fan blades may be attached. It is operated by a one line circuit which conducts an alternating current from the generator or source of electric energy to the field magnet which is a ring of laminated iron slotted in its outer periphery parallel to the axis of the motor so as to form 78 similar, equally spaced radiating teeth on the outer periphery of the stationary field. The winding which forms a part of the primary energizing circuit through which the alternating current is sent from the electric source to the field magnet is carried around every third tooth thereof and is connected with another winding which has a greater number of turns in wave form, partially concentric to it, which spans three teeth instead of one. These two sets of coils constitute the main or primary winding which when energized by an alternating current from a generator or other suitable source produces 26 magnetic poles on the outer periphery of the field. Just outside of this main winding, but in inductive relation to it, are two separate windings in wave form around alternate sets of three teeth throughout the entire periphery of the field, but this winding is displaced circumferentially from the second part of the main winding by one slot. Each of these two secondary windings is short-circuited upon itself and they act together electrically and magnetically as a single circuit and constitute the induced or secondary circuit in the defendant's motor. The magnetic circuit of the armature is formed by a ring of soft iron surrounding the field magnet. The internal face of this ring is slotted in the general direction of the axis of the motor, but at a slight angle

with respect to the plane of this axis and in each of these slots, which are 78 in number, is inserted a copper bar which extends outward from either side of the iron ring a short distance, so that these bars may be electrically connected together at each side of the ring. These bars form the electric conductors for the armature circuit and with their inter-connections the winding of the armature which is directly within the influence of the magnetic poles of the stationary field separated from the latter by a slight air gap only. An alternating current from the generator or electric source sent through the circuit in which the main winding is situated starts and rotates the armature.

All agree that this rotation of the armature is caused by the difference in phase between the primary and secondary currents, but the defendant insists that this difference is produced by retarding a portion of the primary current, and not by the energizing force of the induced current, and hence that the defendant does not infringe the process or the apparatus of Tesla. On the other hand the complainant contends, and the court below found, that this difference in phase is caused by the direct effect of the induced current in the secondary winding and that the defendant infringes its patented process and machine. The testimony of the witnesses upon this issue is conflicting and under a familiar rule the finding of the chancellor must prevail unless the defendant has succeeded in showing from the record that he has made a mistake in his deduction of this fact from the evidence. Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764; Tilghman v. Proctor, 125 U. S. 136, 8 Sup Ct. 894, 31 L. Ed. 664; Furrer v. Ferris, 145 U. S. 132, 134, 12 Sup. Ct. 821, 36 L. Ed. 649; Coder v. Arts, 82 C. C. A. 91, 94, 152 Fed 943, 946, 15 L. R. A. (N. S.) 372; State of Iowa v. Carr, 191 Fed. 257, 112 C. C. A. 477.

Counsel for the defendant contend that such a mistake is shown because, as they claim, the defendant's apparatus is constructed in accordance with the specifications of patent No. 399,801 issued to Thomson & Wightman on March 19, 1889, upon an application filed August 8, 1888, and of patent No. 428,650, issued to Elihu Thomson on May 27, 1890, on an application filed August 8, 1888, and because there is a legal presumption that the device or process of a later patent does not infringe that of an earlier one; (2) because after an interference had been declared between patent No. 399,801 to Thomson & Wightman and patent No. 555,190 to Tesla, the application for which was filed more than three months earlier than that for No. 399,801, the Commissioner of Patents decided that they did not interfere, and, as counsel claim, this decision raises the legal presumption that the defendant's device does not infringe the complainant's patents; and (3) because independent energizing circuits are not produced in the operation of defendant's device, and its motor is not the mechanical equivalent of that described and claimed by Tesla.

[8] The presumptions which counsel invoke are not conclusive, nor are they more persuasive than that which supports the finding of the court below. Brammer v. Schroeder, 106 Fed. 918, 928, 46 C. C.

A. 41, 51; Anderson v. Collins, 122 Fed. 451, 455, 58 C. C. A. 669, 673.

It is, indeed, a general rule that there is a presumption that a process or apparatus of a later patent does not infringe the process or apparatus of an earlier patent relating to the same subject. There is also a general rule that there is a presumption that a process or apparatus of a later patent does not infringe the process or apparatus of an earlier patent between which the Commissioner of Patents has decided that there was no interference. But there is an exception to this rule that where the patentee has made a primary invention of a new and useful process or apparatus which accomplishes a result never before produced by such a process or machine, the presumption that a process or apparatus of a later patent on the same subject is for a subordinate improvement or modification of the primary invention and hence subject to an infringement of the earlier patent which secures it, is at least as strong as the presumptions of the general rules, because there are many more patents for subordinate improvements and modifications of primary inventions than there are for such inventions, and hence more probability that a given process or apparatus is of the former than that it is of the latter class. Ries v. Barth Mfg. Co., 136 Fed. 850, 853, 69 C. C. A. 528, 531; Boyd v. Janesville Hay & Tool Co., 158 U. S. 260, 261, 15 Sup. Ct. 837, 39 L. Ed. 973; Consolidated Valve Co. v. Crosby Valve Co., 113 U. S. 157, 178, 179, 5 Sup. Ct. 513, 28 L. Ed. 939; Morley Sewing Machine Co. v. Lancaster, 129 U. S. 263, 273, 9 Sup. Ct. 299, 32 L. Ed. 715; National Hollow Brake Beam Co. v. Interchangeable Brake Beam Co., 106 Fed. 693, 710, 45 C. C. A. 544, 561; Crown Cork & Seal Co. v. Aluminum Stopper Co., 108 Fed. 845, 861, 48 C. C. A. 72, 88.

The presumptions to which counsel has challenged our attention, therefore, are not determinative of the issue of infringement in this case, and its decision is conditioned by the entire evidence in the record. That evidence establishes beyond doubt that Tesla was the first to discover the process and to invent an apparatus whereby a motor could be started and rotated by the conjoint use of an alternating current conducted from a generator or other suitable electric source through a single primary circuit and an alternating current induced in a secondary circuit in the motor in inductive relation with the primary circuit. He stated in his specifications for his patents that the difference in phase between the primary current and the induced current was the cause of this result. This difference in phase is an attribute of the induction. An induced current lags; it is later in phase than the primary current which induces it.

The motor of the defendant differs much from that patented to Wightman & Thomson, but conceding that it is the mechanical equivalent of the latter, did not Wightman & Thomson and the defendant operate their motors by the same process as Tesla and by mechanical means equivalent to those which he described and claimed? Tesla connected his induced coil in a closed circuit with coils on the projections of his field magnet or on the annular magnet itself. The defendant placed its induced coils on the projections of its field mag-

net in inductive relation with its primary circuit. Winding the primary and induced coils in wave form alternately about sets of three projections instead of around single projections, as did Tesla, so that the sets in the secondary circuit shall be circumferentially separated by one slot from those in the primary circuit, produces magnetic poles and effects corresponding to the sets instead of to the projections, but it is the mechanical and electrical equivalent of the construction shown by Tesla, for by the same process, by the operation of the same principle and by the use of well known mechanical substitutes for the devices shown by Tesla it produces the same result, the requisite difference of phase and shifting of the poles. And a rotating armature around a stationary field magnet is a patent equivalent of a rotating armature within a stationary field magnet.

Wightman & Thomson wrote in their specification that the object of their invention was "to produce from a single alternating current circuit source or coil an alternating magnetic or electric field of inductive action having adjoining portions displaced or differing from one another by a part of a phase of alternation," an object which Tesla had shown them how to attain by his applications for patents Nos. 511,915 and 555,190, which he had filed more than three months before they filed their application for their patent. They wrote that their invention consisted of "the combination, with an alternating inductor (the primary circuit of Tesla) of a locally applied modifier or retarder (the secondary or induced circuit of Tesla) of the inductive action applied directly or indirectly to a part of the field of inductive action directly or indirectly set up by said inductor, whereby a lagging of the alternations of inductive action produced by such part behind those of an adjoining part will be produced, thus giving the effect of two or more adjoining sets of alternations of induction differing or displaced, more or less, in phase," that "the modifier or retarder * * * may consist of a conductor of any desired shape or form adapted to be the seat of electrically or magnetically induced currents produced by the inductor or a portion of the exciting circuit or field of magnetism thereof" that "the conductor acts to retard or cause a lagging in the development of field or extension of field of the inductor at each alternation"; so does the induced circuit and current of Tesla and every induced current in a like situation; that they attribute this effect to "the fact that it becomes the seat of induced currents, which, by their self-induction, tend to continue flowing even after the phase of alternation which would be due solely to induction from the inductor current has become opposite or reversed, though they do not wish to be understood as limiting themselves to any particular theory of action," and the conductor which produces the requisite dephased current is shown by their specification and drawings to be nothing but a coil of insulated wire wound in a closed circuit on or near the field magnet in inductive relation with the main energizing circuit which carries an alternating current from the generator or source. Here, then, as in Tesla's process and apparatus, there was in the patented combination of Wightman & Thomson and in the motor of the defendant the conjoint use to start and rotate a

motor of an alternating current conducted to the motor from a generator or other suitable electric source through a single primary circuit and of an alternating current induced in a secondary circuit in the motor in inductive relation with the primary circuit. Here, as in Tesla's patented inventions, was the production by induction of the same causal difference of phase between the primary current and the induced current, and here, as in Tesla's invention, that difference in phase accomplished the object of the invention, the starting and rotating of the armature of the motor. The principle of Tesla's patented inventions in suit is the use in a motor of alternating currents differing in phase to energize a motor. The principle of the process and apparatus secured to him by the claims in suit is the use to start and drive a motor of an alternating current conducted to it by a primary single line circuit and an induced current produced by or from the primary circuit in a closed circuit in inductive relation with the primary circuit. Wightman & Thomson and the defendant adopted these principles and their motors operate upon them. They use the process patented to Tesla, the process of operating motors by passing an alternating current through the primary circuit and inducing an alternating current in the secondary circuit in inductive relation with the primary circuit. They use mechanical means equivalent to those described and claimed by Tesla, the combination of two circuits, one the primary adapted to be connected with a source of alternating current, the other the secondary in inductive relation to the first, and by this process and these means they accomplish the same result which Tesla obtained, they start and rotate the motor, and as the defendant used the principles of operation, the process, and, with immaterial mechanical variations, the combination and machine patented to Tesla, he cannot escape the charge of infringement.

[9] The truth is that the difference between the process and apparatus patented to Tesla and the combination patented to Wightman & Thomson and that used by the defendant is a difference of name, not of principle, process, means, or result. Wightman & Thomson and the defendant call the induced circuit a modifier or retarder, while Tesla calls it an independent energizing circuit. There is, however, no substantial difference in the circuits themselves, in their purpose, their operation, or their effect, except that possibly Thomson & Wightman's may be simpler or less expensive than Tesla's and perhaps patentable as an improvement on his inventions. Tesla's patents, however, rested on the earlier applications and are senior in effect. They secure inventions primary in character and the use by Wightman & Thomson or the defendant of their substantial improvements constitutes no defense to the charge of infringement of Tesla's senior rights. Tesla Electric Company v. Scott & Janney (C. C.) 97 Fed. 588, 599–602.

Much time and labor have been expended in the trial and argument of this case upon the question whether or not the induced circuit in the motors of the defendant is an "energizing circuit." In our opinion the weight of the evidence sustains the conclusion of the court below that it is such a circuit within the patent meaning in which that

term was used and defined in Tesla's specification which has been stated more at length in an earlier part of this opinion.

Moreover, whatever the true name of this circuit, it is in electrical and legal effect the same circuit produced in the same way, operated on the same principle by substantially the same means and producing the same result as Tesla's induced circuit. It is substantially the same thing electrically and mechanically. And it is no defense to a charge of infringement of a process, a machine or a combination clearly described and claimed in a patent that it, or some part of it, was misnamed therein, or that the infringer has called it by a name different from that applied to it by the patentee. Patents protect new and useful processes, machines and combinations, whatever their names, when they are clearly described and claimed in the specification. And the conclusion is that the defendant infringes the claims in suit because its motor operates upon the same principles, by the use of the same process and of mechanically equivalent means and produces the same result clearly described in the specifications and secured by the claims. The decree below must accordingly be affirmed, and it is so ordered.