OTIS ELEVATOR CO. v. KAESTNER & HECHT CO. (two cases).

SPRAGUE ELECTRIC CO. et al. v. SAME.

(District Court, N. D. Illinois, E. D.    June 9, 1916.)

Nos. 30294, 30295, and 30306.

1. PATENTS ⬤⟲328—VALIDITY—CONTROL OF ELEVATOR OPERATION.
    The Sundh patent, No. 861,197, for control of elevator operation, is void for anticipation.

⬤⟲For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. PATENTS ⬯328—VALIDITY AND INFRINGEMENT—ELEVATOR CONTROL.

The Herdman patent, No. 548,830, for control of elevator operation, is valid, and entitled to a fairly broad construction and range of equivalents. Claims 18, 19, 20, and 21 also *held* infringed.

3. PATENTS ⬯328—VALIDITY AND INFRINGEMENT—ELEVATOR CONTROL.

The Sprague patent, No. 815,756, for control of elevator operation, was not anticipated, and is not void for double patenting, because of the Sprague patent, No. 660,065, application for which was pending at the same time. Claims 9 and 10 also *held* infringed, and claim 1 not infringed.

4. PATENTS ⬯120—VALIDITY—IMPROVEMENT—PATENT.

A patent for a device which is an improvement on that of a prior patent to the same inventor, to adapt it to a different use, is not invalid because it includes the prior invention.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 172; Dec. Dig. ⬯120.]

In Equity. Suits by the Otis Elevator Company and by the Sprague Electric Company and the Otis Elevator Company against the Kaestner & Hecht Company. Decree for defendant in one suit, and for complainants in the other two.

Brown, Nissen & Sprinkle, of Chicago, Ill., for plaintiffs.

Miller & Chindahl and Lincoln B. Smith, all of Chicago, Ill., and Richard Eyre, of New York City, for defendant.

SANBORN, District Judge. Infringement suits on patents for control of elevator operation. The first suit was brought in January, 1911, on patent to Frank E. Herdman, No. 548,830, issued October 29, 1895; the second was brought in January, 1911, on the patent to August Sundh, No. 861,197, issued July 23, 1907; and the last brought in February, 1911, on the patent issued to Frank J. Sprague, March 20, 1906, No. 815,756.

[1] *Suit No. 30,295, on Sundh Patent.* I adopt the description of counsel for defendant in their brief in the Sundh suit, as preliminary to a consideration of these three cases:

"It will better conduce to an understanding of the purpose and means of the Sundh patent and of the prior art references if certain characteristics of motors are first understood. An electric motor is composed of two main parts, its armature and its field magnet. The field magnet is a fixed structure magnetized by coils thereon, and these coils are known as the field winding. In elevator practice this field winding is in a shunt or branch circuit, and the motor is known as a shunt wound motor. The armature of the motor is the revolvable member and carries a number of turns of wire, which lie in the magnetic field produced by the field magnet. It is a law of electromagnetism that whenever a wire is moved through a magnetic field in the proper direction an electric current tends to be generated in that wire, and will be generated if that wire is connected in a closed circuit. The converse is equally true, namely, that when a wire lies in a magnetic field, and a current is sent through the wire from an outside source, the wire tends to move through the magnetic field. Therefore we have such a structure having a fixed field magnet and a revolvable armature, with wires properly located thereon and connected to an outside circuit. We have a structure that will act as a motor if current is supplied to the wires of the armature from an outside source, and will act as a generator if the armature is rotated by an outside force and the wires upon it are closed through an outside circuit. In other

words, the same structure is a dynamo generator or a motor, according to whether the armature is driven by an outside force or whether current is supplied to the armature from an outside source.

"In either case, as the armature is revolving it generates a voltage, or electromotive force, or pressure, and it is therefore to that extent a generator, even when it is acting as a motor. When it is acting as a generator, this voltage or electromotive force or pressure determines the output of current from the armature. When the structure is acting as a motor—that is, when it is being driven by the current supplied to it from an outside source—the pressure or voltage or electromotive force that is generated by the rotation of the armature is opposed or counter to the electromotive force applied to the armature from the outside source. In this case the current flowing through the armature is determined by the difference between the electromotive force applied from the outside force and the counter-electromotive force generated by the motor.

"The electromotive force generated by a dynamo and the counter-electromotive force generated by a motor vary with two factors, the rate of movement of the armature and the strength of the field of the field magnet. When a motor is at rest, therefore, it has no counter-electromotive force, and if the full electromotive force of the outside force were applied to it, it would take a very large current compared to that which it would take if it had developed speed and therefore the counter-electromotive force to oppose the applied electromotive force. It is for this reason that in starting a motor from rest it is customary to include a considerable external resistance in series with the armature, so as to cut down the current flowing through it, which resistance is removed gradually as the speed of the motor increases and its counter-electromotive force develops.

"To reverse the motor it is necessary either to reverse the current in the field winding or to reverse the electromotive force applied to the armature. Such a reversal of one or other of these currents causes the armature to rotate in the opposite direction. Suppose, now, that the motor is revolving at a high speed in one direction and its counter-electromotive force is high, and is preventing any but a normal current from passing through the armature. If we should accidentally reverse the connections to the motor, we would find that what was before a counter-electromotive force, protecting the motor, becomes an electromotive force assisting that of the outside force, and therefore tending to send an enormous current through the armature. The electromotive force is no longer counter to that of the applied electromotive force, because the electromotive force generated by the rotation of the armature is in the same direction as before, whereas the applied electromotive force is in an opposite direction. It has, therefore, long been recognized that in automatic control systems, such as that employed in elevator practice, a means should be provided for preventing reversal of the connections of the motor to the outside source, except at a time when the motor is at rest or of a low enough speed so that it will not develop so high an electromotive force as to cause a dangerous flow of current through the motor.

"Since the reversal of the motor requires the disconnection of one of its elements and its subsequent connection in a reverse direction, and since the electromotive force across the armature terminals at the moment of disconnection is a measure of the speed of the motor, Sundh (and the prior patentees) made use of this principle by providing a protective magnet so connected that it would be energized when the electromotive force generated by the armature is high at the time that it is disconnected from the circuit and employed this protective magnet to prevent the operation of the mechanism to reverse the motor."

In the operation of the patent in suit the operator may energize the operating circuit for either up or down by turning his lever right or left. The current will then pass from its source of supply through one or the other of two reversing coils, and pull up its switch to establish an electrical connection for the armature through its rheostat, and thence through the contacts controlled by a protective magnet, to

the ground. This magnet is not energized, except when both reversing switches are open. The same movement of the operating arm sends a current through the contacts established by the operating current in the reversing coil, through the armature, its rheostat, and back to the ground. Suppose the car is now going up and the operator wishes to go down. He turns his lever to the right and into engagement with a contact for downward motion. If now the reverse current should be allowed to be turned into the armature, which is still going at high speed, it would have an electromotive force assisting that applied to it, and there would be an abnormal rush of current through the motor. This brings us to the device that Sundh adds to remove this defect. Moving the arm off the contact for up motion deenergizes one of the reversing coils, which thereupon drops its core, closing a contact of a circuit through the protective coil, which, when sufficiently energized, lifts its core, and breaks the operating circuit. So, although the operating lever has been swung into engagement with the other reversing coil, no current can reach it, because the operating circuit is broken.

The protecting coil must be sufficiently energized to lift its core and keep the operating circuit open. This is accomplished as follows: The protective magnet is, whenever both reversing switches are open, connected across the motor so as to be energized proportionally to the electromotive force generated by the motor, and this force of the slowing motor keeps up a sufficient current through the protecting coil to prevent the operating reversed current from reaching the motor until it has so slowed down that its electromotive force is not sufficient to keep the coil energized enough to hold up its core. When the core falls, the operating circuit for downward motion is closed, and the motor revolves in the other direction.

This is all there is to the Sundh apparatus. The idea is simply that there shall be a protective magnet, which is energized by a circuit connected across the motor, and which, by reason of its energization, shall prevent the operation of the reversing mechanism to reverse the motor. It is an incident of Sundh's employment of separate reversing switches, which also serve as closures of the circuit from the source to the motor, that he can only close the circuit of his protective magnet when both reversing switches are at the open position. This he accomplishes by employing back contacts co-operating with the reversing switches.

Defendant's construction is practically the same as that of the patent in suit, so the only question is that of its validity.

*The Prior Art.* Four prior patents are relied on as anticipations. They are Whittingham, No. 821,009, Lindstrom, No. 544,768, Voight & Haeffner (German), No. 15,593, and Sautter, Harle & Co. (French), No. 320,365.

The Whittingham patent was applied for December 9, 1902, but it was issued after Sundh filed his application. It is, therefore, not a prior patent, but the application on file is conclusive, in the absence of contrary proof, that the invention was "known to others in this

country"·prior to the invention of Sundh. If Whittingham, therefore, anticipates Sundh, the patent in suit is invalid.

Whittingham had the same end in view as Sundh. He says the "object is to provide an apparatus of this character wherein, when the motor is reversed, it is absolutely protected against the introduction of current until after it has first been stopped and is in condition to safely receive current to drive it in the opposite direction." This object is attained by both in a somewhat different ·way. In each case, when the operator throws his switch to stop the motor, or there is a break out on the line, the protecting magnet is energized according to the electromotive force of the motor, and the magnet pulls up its coil and prevents the introduction of current to the reversing coils. When ·the motor slows down the protective coil is de-energized, drops its core, restores the circuit through the reversing coil, and permits the motor to be again safely started.

The different way just referred to consists in three things: First, in keeping. the protecting coil energized all the time the motor is performing its ordinary. work, instead of being de-energized as in Sundh; second, in breaking the operating circuit when the operator swings the arm to neutral position at a point in the main supply line instead of at the point in the operating circuit controlled ·by the protective coil; and, third, that the protecting coil operates when one of the reverse ·switches is in operating position, instead of both ·being open, as in Sundh. These differences result from keeping the protecting switch constantly energized, and cutting off its direct line supply when the main line opens, whereupon its energy is kept up by the electromotive force supplied by the falling motor deprived of its current, but still running slower and slower, just as in Sundh. Thus in Whittingham the protecting coil, being constantly energized, is always "standing guard" over the armature. Whittingham· describes the operation in substance as follows, omitting his numerals, and changing his phrase-.ology:

"When the controller (operating switch) is moved to the opposite position its first effect is to break the circuit through·the magnet governing the main line switch, and thus release blade ·3, whereupon the main circuit through the field and the armature is broken. As the field is connected in shunt to the armature, whether the' reversing switch is in one position or the other, then when the main circuit is so opened the armature, continuing to rotate, will supply current to the field circuit, which includes the protective coil. This coil being thus energized will continue to hold its core bar away from its ·contacts, and so long as this continues the appropriate reversing coil cannot be short-circuited, and the reversing switch must remain in its original position. This condition of the circuits continues so long as there is any current of appreciable strength in the armature and field circuit. When the current dies out ·of the field winding, due to the armature coming to rest, the protecting coil will be de-energized, and its core will drop, causing the core blade to connect its two contacts, whereupon the proper reversing coil is short-circuited, and the other reversing coil receives double current, and becomes operative, and restores· the circuit to the line magnet, closing the main line and driving the motor as before."

This description reads on Sundh in substance. Any experienced electrical engineer, knowing of the previous plan of Whittingham and

those of the three other patents referred to, could easily design either the Sundh device or that of the defendant.

At the hearing two Whittingham constructions were tested, and both proved operative, whether the operating current was broken by the operating switch or out on the line of supply. The practical operation and result was the same as in the patent in suit. The Sundh patent should be held invalid, because the invention was that of Whittingham; also because anticipated by the three other patents referred to.

Decree for defendant, with costs.

[2] *The Herdman Patent, Suit No. 30,294.* A high speed elevator must be slowed down as it approaches its stopping point, either by the operator or automatically. It will not do to shut off all the power, and trust to momentum alone. There must be some driving power left, both to make a proper stop and to stop short of the terminal and then start again, if necessary. Both parties accomplish this in different ways, and the only question of much importance is whether they are equivalent ways.

Both parties use an automatic slow-down, entirely beyond the operator's control. Full speed is obtained by putting resistance into the electric circuit supplying the shunt field, similar to obstructing a water pipe. As the field thus gets less current strength, the armature has less resistance to overcome and goes faster. Being directly geared to the elevator winding drum, the latter gets up to full speed. When it is desirable to slow up, the resistance is cut out, the field is strengthened, armature resistance increased, and speed lessened. This is what is done by both parties; plaintiff directly and defendant indirectly, but both without allowing the operator's volition to have any influence.

In both machines full speed is obtained by carrying the field current through a rheostat. As the car nears the end of its run up or down the winding drum is made to close a switch. This at once cuts out the rheostat, permits full current to flow through the shunt field, giving increased armature resistance, and slowing the speed, but still leaving the car driver in full control at the slower rate. Plaintiff's switch short-circuits the resistance, while defendant's takes it out through a relay motor or solenoid. The modes of operation in the two machines are different.

Described in another way, the object of plaintiff's device is thus stated by Herdman:

"In a previous patent granted to me, No. 506,911, dated October 17, 1893, there is shown, described, and claimed automatic devices moved by the winding drum and adapted at predetermined points to affect the operating mechanism and bring it to its central position. With this arrangement, if the operator should stop the car after the automatic devices have commenced to operate and before he has reached the final stop, it is difficult for the operator to throw current on the machine to continue the travel in that direction, so that, if he wishes to continue to the end of the travel, the operator would have to reverse and return to a position before the automatic devices begin to act, when he could throw on the current to run to the end of the travel. The space for the action of the automatic devices being, according to the speed of the machine, from six to ten feet, this distance is so great that at times the operator is called upon to stop the car within that

space. While I do not intend to discard these automatic devices, the construction hereinbefore described is intended to be used with these automatic devices; they being adjusted to act within a. short distance of the end of the travel of the car—say within two or three feet—and the devices described being placed to act at some distance before these automatic devices, to bring the motor to a slow speed independent of the operating mechanism, thereby within this limit, enabling the operator, in case the car should be stopped, to again throw on the current and proceed in the same direction until the automatic devices acted."

The automatic slow-down made by strengthening the field, as above described, accomplishes the result sought. The invention is an exceedingly useful one, having been used in large buildings in New York on elevators having a speed of 600 feet per minute. Little attempt is made to show anticipation, which was not urged at the hearing. Defendant's brief states that the case turns on the question of infringement. It is evident that the claims are entitled to a fairly broad range of equivalents. All claims are in issue, except 14, 15, 16, and 17. There are three groups of claims, one group relating to the slow-down generally. Another group applies to the slow-down, controlled both automatically and by the mechanism used by the operator, and controlled by him. The third group applies to the slow-down, automatically controlled, entirely independent of the mechanism used by the operator, or whose function is controlled by the movement of the starter.

In order to test the question of infringement, it is essential to describe the exact mode of operation of defendant's mechanism, whose result has been stated to be the same as plaintiff's. To complete the high speed defendant so arranges its wiring as to energize a solenoid or speed relay motor with a dashpot. The pulling up of the latter by the current through the solenoid releases two switches in succession and causes the current from the plus supply to go through four rheostats or resistances and thence to the shunt field. This weakens that field, and the armature, then having a diminished resistance, goes faster, up to its speed limit. In order to slow down automatically the winding drum is provided with connecting gear wheels, so that when the proper number of revolutions of the drum has occurred the current is cut off from the speed relay solenoid, the weight of the dashpot cylinder is released, and the latter falls, breaking the current through the rheostats, and allowing full current to pass through the shunt field. This increases the field resistance, and slows the armature, accomplishing the "automatic slow-down."

The slowing operations in each design may be thus compared: In both the work is automatic, beyond the operator's control. Both slow the armature by removing shunt field resistance, and thus increasing field strength. The result is the same in both, and that result depends on identical factors, the field and the armature, and so far as these are concerned the operations are the same in each, though caused in different ways. Plaintiff short-circuits the field rheostat by directly taking away its current, permitting the main current to go into the shunt field. Defendant, on the other hand, breaks a circuit through the field rheostat by releasing a dashpot plunger from a

solenoid previously charged with current, permitting the main current to go to the field around the rheostat instead of going through it. In other words, defendant does by a relay what plaintiff does without one.

To use an illustration of plaintiff's counsel, it is like gathering apples by picking them while standing on a stepladder, or climbing the tree, and by knocking off with a fish pole. Both systems employ pilot motors. In one a current is taken to the field without the use of this motor, while in the other it is momentarily employed. But in both the full field supply goes around these motors. The fact that Herdman's resistance is in a single section, and is cut out instantaneously, while defendant's is in four sections, cut out one after the other practically at once, is immaterial, because the two operations are equivalent, with no substantial loss of time in either. The substance and essence of the invention are used by defendant, under the rule of Morley Machine Co. v. Lancaster, 129 U. S. 263, 282, 9 Sup. Ct. 299, 32 L. Ed. 715.

While defendant's wiring plan is exceedingly complicated, requiring careful study even by an experienced electrical engineer, yet it may be sufficiently understood by the aid of the elaborate expert testimony on each side, and the foregoing conclusions are free from doubt.

Descending more to particulars, Herdman removes the field resistance by automatic action working entirely independent of the resistance device, or any of its operations. Just before the automatic action occurs, the field circuit is established through the resistance, so as to get full speed by decrease of field current. Then a new circuit is instantly put into the field, entirely outside of both the resistance and the resistance device. As Herdman says, this "enables the speed to be reduced without changing or affecting the operating mechanism." This is done by moving a switch 8 by gearing from the winding drum.

Another feature (not yet explained) consists of another switch 7 in this same independent circuit, which is not automatic, but actuated by the operating mechanism. The purpose of this switch is to make the automatic slowing down effective only for one direction of travel of the elevator, so that if the motor has slowed down or stopped, and the operator desires to move his elevator in the opposite direction, he may do so as rapidly as he can manipulate his operating mechanism. This switch is controlled by the operating mechanism, being connected to the operating bar G. This second switch, therefore, makes the slow-down switch effective at the upper limit of the elevator only for upward movement of the elevator, and at the lower limit of the elevator only for the downward movement of the elevator. This switch is not a part of the operating mechanism, and can be removed without in any way disturbing any of its ordinary functions. Its function is entirely dependent on the previous automatic movement of switch 8.

Having seen that the mechanisms of both parties accomplish the slow-down by strengthening the shunt field, through cutting out the resistances in the field circuit, and thus slowing the armature and the

car, it remains to inquire whether the claims read upon defendant's method of accomplishing this slowing down.  Claim 1 follows:

1. The combination with an electric motor and a source of current supply—

(1) Of an electric circuit from the source of current supply to the field of the motor.

(2) A resistance device in said circuit.

(3) A circuit to the field independent of the resistance device.

(4) A switch device controlled by the motor in said last-mentioned circuit.

The third element is found in the first 15 claims in the same words, and in substance in claims 16 and 17.  Defendant's counsel argues that this third element is not employed by it; but I think it may fairly be said that the independent circuit which carries the full field strength and speeds up the motor is so far independent of the resistance device as to come within the first 15 claims.  This circuit does not touch the rheostat, nor the solenoid which throws out the rheostat, though it goes through one of the switches of the resistance device, so it is not entirely independent of the resistance device, but sufficiently so for the purposes of the case under the rule of liberal construction which should apply.

The fourth element of claim 1 is in claims 2, 3, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 22, 23, 24, and 25.  All these claims call for a switch device or devices in the independent field circuit.  These switches are the slow-down and set switches shown in patent Figure 4, and similar switches are used by defendant, shown on Matthews' sheet 2 as *21* and *23*.  But these latter switches are not in the independent circuit at all.  Their movement establishes that circuit, but the circuit itself does not touch them.

Claims 16 and 17 are not in suit.  This leaves for consideration only claims 18, 19, 20, and 21.

Claim 18.  The combination with an electric motor and a source of current supply—

(1) Of a device controlled by the motor,

(2) And, adapted after a predetermined number of revolutions of the motor,

(3) To change the relation to each other of the strength of the current passing to the armature and field independent of the operating mechanism.

Claim 19:

(1) Same.

(2) Same.

(3) To increase the strength of current passing to the field of the motor independent of the operating mechanism.

Claims 20 and 21 are substantially like 18.

These four claims do not read with exact literalness on defendant's structure, because the latter uses the operating mechanism to change the relation of armature and field, and to increase field strength and thus slow the armature.  It is true, however, that the current passing to the field, when once established, is entirely independent of the

operating mechanism. It does not touch any part of the operating circuit. The substance or essence of the Herdman invention was to establish a slow-down having an electrical circuit automatically established by the revolution of the winding drum, and, when so established, to be entirely outside of the operating mechanism. This condition is true in defendant's mechanism. When the slow-down circuit has been established (it is true by the use of part of the operating mechanism), that circuit is, like Herdman's, entirely outside such operating mechanism.

It is, of course, obvious that defendant's field rheostat is part of the operating mechanism during the full speed period, and until the speed relay is de-energized and the rheostat removed. But when this has been done the slow-down is "independent of the operating mechanism" as a whole, though touching a corner of it, just as Herdman's independent circuit touches one corner of his operating mechanism; that is, the hub of arm $R^3$.

I think, therefore, that all the claims of the Herdman patent except 18–21 are so limited as not to be infringed, but that these four are sufficiently broad to cover defendant's device. In this case there should be a decree for plaintiff, declaring infringement of claims 18, 19, 20, and 21, and for an accounting of profits and damages; each party to pay its own costs.

[**3**] *Case No. 30,306, on Sprague Patent No. 815,756, March 20, 1906.* This invention is upon a system of electrical control of elevator apparatus, including control of speed and of current direction, and protection to the motor in case of a sudden turning off and on of the current supply by accident on the line or otherwise.

The first claim covers two results, one the running of the armature at one speed by removing resistance in the armature circuit, and at a higher speed by inserting field resistance. This is under the operator's control through contacts made by the operating lever. Claims 8, 9, and 10 cover means for preventing the turning on of current to the motor, once it is turned off, until other means have operated to restore the starting resistance so that the motor will be duly protected. Claims 1, 8, 9, and 10 are alone in issue.

As to the first claim there was nothing broadly new in removing armature resistance to speed up, and putting in field resistance to go faster. This was what occurred in the Herdman device, just considered, and the idea was in itself old. It is claimed by defendant that Sprague's particular system of control was anticipated by See & Tyler, No. 531,070, and by Lindstrom, No. 538,377.

When the operating switch is moved upon the starting contact, current is turned on, but the motor revolves but slowly, because all the resistance is in series with the armature; that is, the driving current has to go through a number of rheostats before reaching the armature, and part of the driving current, after going through the resistances, is also taken off by a side track or shunt, so as further to retard the armature speed. At the same time the field is kept at its maximum strength. The result is that the motor starts slowly, and does not reach full speed until the operator shifts his lever to a contact which

sets the controller motor into action, resulting in cutting out that part of the armature resistance which is in series, inserting that part which is in the armature side track or shunt, and inserting resistance into the field. The two speeds, intermediate and high, are subject to the terms of the first claim, unless something more must properly be read into that claim. The first speed is obtained by leaving in the armature resistance and dividing the current and by keeping up the field, and second speed by reversing these conditions. So far as these results are alone concerned, there is nothing requiring much exercise of the inventive faculty, whatever may be said of the Sprague invention as a whole. Reading the first claim will show that on its face it covers only means for actuating controller mechanism to increase armature current and decrease field strength.

The claim calls for "means" for doing two things, increasing armature strength and decreasing field strength. All the means necessary to accomplish these results are described and illustrated. They consist of the operating switch, a small shunt motor called the controller motor, a screw-threaded motor shaft provided with two sliding nuts, and a shunt opener switch marked $4\!\mathscr{Z}$. The co-operation of these four elements is essential to obtaining full speed. The right-hand one of the sliding nuts cuts out armature series resistance and by the same movement introduces armature shunt resistance, so as to keep all the current on the series wire. This supplies the full armature current. The left-hand sliding nut closes a solenoid circuit to cut out a field resistance shunt, which weakens the field and speeds up the motor by decreasing the counter-electromotive force. Thus we have full speed conditions, all that is called for by claim 1. The controller motor and its left-hand sliding nut do a number of other things at the same time the speed is increased; but they relate to other conditions, counted on in claims 8, 9, and 10, and have nothing directly to do with obtaining full speed. Thus the traveling nuts must be brought back by reversing the controller current before a second high speed can be obtained; but claim 1 says nothing about reversal means, merely counting on means for getting such speed.

*Claims 8, 9, and 10 of Sprague Patent.* Claim 1, just considered, relates to the provision of an operator's switch and a motor controller mechanism, including certain resistances; the essential idea of the claim being that at one position of the operator's switch the controller mechanism shall act to remove the resistance in the armature circuit of the motor to permit the full current to flow through the armature, and at another position of the operator's switch the controller mechanism shall act to insert a resistance in the motor field circuit to weaken the field of the motor. Thus different motor speeds may be maintained according to the position of the operator's switch. Claims 8, 9, and 10 involve a safety arrangement, covering means for preventing the turning on of current to the motor, once it is turned off, until other means have operated to restore the controller mechanism to its initial position, at which time the armature resistance is all in circuit. The particular instrumentality to effect this specific purpose is a so-called cut-out switch in the governing circuit, which switch opens

when the controller mechanism is moved, and a bridging or maintaining circuit around such switch which is opened automatically when the governing circuit is opened.

It has already been seen that one of the sliding nuts on the shaft of the small pilot motor in its initial movement removes the series resistance in the armature circuit, and inserts the armature shunt resistance; also that the other nut has closed the shunt opener switch to insert the field resistance, thus bringing the main motor to its highest speed. This has resulted from either one or two swings of the operating switch, the first turning on current to the armature while its resistance is in series, and the other turning on current to the pilot motor, so as to remove this resistance and also weaken the field, or turning on both currents. At the same time the pilot motor has accomplished other things relating particularly to the protection of the armature spoken of. It has closed the pilot reversing switch, preparatory to bringing back the two sliding nuts to initial position and reinserting the starting resistance. It has also interrupted its own current and stopped, by opening switch *34,* and has also opened the important cut-out switch *13.* These have all been done preparatory to reversing the pilot motor and bringing the apparatus back to initial position, meanwhile protecting the line so that no armature current can be turned on until the starting resistances have been reinserted.

The function of the cut-out switch *13* may be thus indicated: When the operating switch is first moved, current is admitted to a circuit through a stop relay solenoid which governs a protective shunt, the pilot motor, and the armature brake coil. When the current is on, and the elevator running at full speed, the operator may open his switch, or the line circuit may be accidentally opened. This results in the stop relay coil being de-energized and dropping its contacts. If now current is suddenly restored, and were permitted to reach the armature without going through the starting resistance, the machinery might be theoretically destroyed, though actually protected by a fuse. The relay coil having dropped its contacts, as indicated, control is taken away from the operating switch, and cannot be restored until the controller mechanism is brought back to initial position, and the circuit at the cut-out switch restored, upon which operating current may again flow just as in the first operation. The gist of the whole matter is that the controller mechanism protects the armature from sudden accesses of electric current when the starting resistance is not in place, and continues to so protect it until it is safe to admit the driving force. Claim 10 covers the whole ground by counting on these elements:

"10. The combination of a motor, controller mechanism therefor, an operator's switch for operating the controller mechanism, a cut-out switch arranged to be opened when the controller mechanism is moved from initial position, a bridging contact for closing the circuit around the cut-out switch, the said contract being arranged to be opened automatically when the circuit is opened, thus taking control from the operator's switch, and means for restoring the controller to initial position and closing the cut-out switch independently of the operator's switch, thus restoring control to the operator's switch, substantially as described."

*Infringement of Claim 1.* The first claim is a broad one on its face, but it is obvious that the prior art abundantly limits it to the particular means shown in the description and Figure 1. There were numerous methods for gradually removing starting resistance in the armature circuit and for cutting in field resistance, to obtain intermediate and high speed. Two alleged anticipations relied on by defendant are See and Tyler, 531,070, and Lindstrom, 538,377. Both show particular means for accomplishing the speed control in question, by cutting out armature resistance and cutting in field resistance. They do not appear to me to anticipate Sprague, who shows a more efficient plan in some respects, but they do limit the broad claim for "means" reaching similar results.

It is no doubt true that Lindstrom and See & Tyler do not show mechanism as fully operative as defendant or Sprague. The overhaul, or tendency of the motor to act as a generator when running up lightly loaded, or running down heavily loaded, is not taken care of. In See & Tyler the solenoid circuit for cutting in field resistance is directly across the armature, so as to be affected by its counter-electromotive force. But both patents show means for doing just what Sprague's claim 1 does, and neither one is inoperative, though not as efficient as the later devices. Sprague is thus confined to his improved mechanism, which defendant does not use.

Defendant's system is different from Sprague in detail. For the controller motor defendant uses a solenoid to close valves for the purpose of cutting out the series resistance. Sprague puts in an armature shunt resistance, which is not used by defendant. To insert the field resistance Sprague uses the controller motor, the shunt opener switch, and a solenoid, while defendant uses a solenoid (described in the preceding opinion as the speed relay motor) with one of its switches.

The result is the same, but the means and operation are quite different. In view of the prior art there is no infringement of claim 1.

*Infringement of Claims 8, 9, and 10.* Infringement of claims 9 and 10 would clearly appear, except for one doubtful element, which is:

"Means for restoring the controller to initial position and closing the cutout switch."

The Sprague structure, as already shown, reverses the controller current and thus brings back the sliding nuts, either to initial position, or as far as the operator desires, thus cutting in the armature resistance to any desired extent, and obtaining different speeds as a result. This result (partial or complete) seems to be covered by the quoted element, since restoring the controller to initial positions involves stopping it in one or more intermediate positions because of the necessary connection of the controller circuit with the operator's switch contacts. Defendant's system of return to initial position is simply a dashpot, which restores the controller by gravity without stopping it in any intermediate place. The dashpot, it is true, reads literally on the quoted language, "restoring the controller to initial position," and the defendant does that identical thing, accomplishing by gravity what Sprague does by reversing an electric current. Sprague may incidentally do

another thing, by throwing off the reverser current, obtaining a modified speed, and then moving on to the initial point. Stated in another way, one of the results accomplished by Sprague is obtained by defendant, but with a different operation and by different means. Whether this amounts to infringement depends on the breadth of construction and range of equivalents which should properly be given to these claims 9 and 10.

This question of range of equivalents depends on three prior patents, two taken out by Sprague, Nos. 660,065 and 696,880, and the other by Wright & Kinsey, No. 509,505. The first of the Sprague patents is the well-known electric railway multiple unit system, which made practicable the operation of electric trains of two or more cars, and the running of them forwards or backwards with equal facility. The other Sprague patent was for an improvement upon the first. The applications for these two Sprague patents, and for that in suit, were all copending, so there is no question of anticipation under the rule of Century Electric Co. v. Westinghouse El. & Mfg. Co., 191 Fed. 350, 112 C. C. A. 8. It is, however, claimed by defendant that the subject-matter of claims 8, 9, and 10 is found in the Sprague railway patent, and that those claims are void by the law of double patenting, as held in Miller v. Eagle Mfg. Co., 151 U. S. 186, 14 Sup. Ct. 310, 38 L. Ed. 121, and Western El. Co. v. Galesburg Union Tel. Co., 148 Fed. 857, and in this court, 144 Fed. 684, 75 C. C. A. 500.

As to the Wright & Kinsey patent, one of its objects is stated to be the adaptation of safety appliances in such a manner that there is little danger of burning out the motor. The differences between Sprague and Wright & Kinsey are fairly stated by defendant's counsel as follows:

"The cut-out switch of Wright & Kinsey is, like the cut-out switch of Sprague, located in the governing circuit, being directly in series with the coil $F$ of the controller mechanism. Both Sprague and Wright & Kinsey desire that the motor circuit shall not be closed in case the protective resistance is not all in the armature circuit and dangerous current is flowing. Sprague provides his cut-out switch and bridging contact, which act every time the controller is operated, whether or not this condition is present. Wright & Kinsey provide a coil which permits the cut-out switch to open only when an abnormal current is beginning to flow. This is the only time that the cut-out switch combination is of any utility, and Wright & Kinsey operate it at this time only. This seems on the whole a most sensible procedure to adopt. When the Wright & Kinsey cut-out switch does actually open it is because the dangerous condition to be guarded against has occurred. Therefore, instead of establishing the mere shunting around the cut-out switch, they establish a circuit through contacts and a lever to energize a coil of the controller mechanism and coils of the reversing mechanism to immediately open the motor circuit and bring the controller back to initial position. This is exactly what is done in the Sprague case when the bridging contact is opened by the failure of current or the opening of the operator's switch. As in Sprague the cut-out switch cannot be closed after it has once opened until the controller is restored to initial position, this restoration being effected by the downward movement of the rod $S$ of the controller mechanism."

In other words, the Wright & Kinsey cut-out operates only in cases of overload, and not at all during normal conditions. Claims 8, 9, and 10 are not limited to overload apparatus, but apply both to

normal and abnormal conditions. The mode of operation is quite distinct. There is also a question as to the practical effect of the Wright & Kinsey switch in protecting the motor from overload. I adopt the argument of plaintiffs' counsel, pages 127–136, as to the Wright & Kinsey invention, with their conclusion that it does not anticipate Sprague.

In view of these conclusions on double patenting and the prior art, I think that claims 9 and 10 were not anticipated, and are entitled to a liberal construction, and that defendant's dashpot is a means for restoring the controller to initial position, within those claims, although Sprague accomplishes also other results not possible by defendant's construction. If it were not for the question of double patenting infringement would be clear.

In regard to claim 8, the element of means for restoring the controller to initial position, and closing the cut-out switch, is omitted. If this be read in, claims 8 and 9 would be identical. Without this element, claim 8 would be invalid for inoperativeness. The claim may therefore be ignored.

*Double Patenting.* The question is whether the claims of the patent in suit relate to a separate invention distinctly different from that of the railway patent. The claims in neither of these patents are limited to railway practice or elevator practice. In the railway specification the patentee says that some features of the system are applicable to elevators. By his figures he illustrates only railway operation in the first patent and elevator operation in the second.

There is no question that Sprague shows a similar system of speed control in both patents. There is the same cut-out switch, the same bridging contact, governed by the same solenoid, and the same result, in the protection of the motor. Claim 209 of the first patent may be compared with claim 7 of the last. While claim 7 is not in suit, it may properly be referred to in order to show the identity of the two inventions.

Comparison of claim 209, first patent, and claim 7 of the second (not relied on in this action):

| Claim 209. | Claim 7. |
| --- | --- |
| (1) A motor. | (1) A motor. |
| (2) A motor circuit. | (2) A motor circuit. |
| (3) A current varying controller for the motor. | (3) A controller for the motor. |
| (4) An operator's switch and circuit for operating the controller. | (4) An operator's switch in circuit for operating the controller. |
| (5) Means for opening the motor circuit independently of the controller. | (5) Means for opening the motor circuit independently of the controller. |
| (6) Means for restoring the controller independently of the operator's switch. | (6) Means for restoring the controller to initial position independently of the operator's switch. |
| (7) A cut-out switch connected with the controller, And closed in certain positions thereof, Which, when closed, restores control to the operator's switch. | (7) A cut-out switch connected with the controller, And closed in certain positions thereof, Which, when closed, restores control of the controller to the operator's switch. |

While claim 7 is not in suit, claims 8, 9, and 10 are, and the elements of those claims are found in a number of the claims of the railway patent in broader form.

There is no doubt that the same invention is covered in both patents, and claimed in both, for entirely different purposes. Both inventions are highly meritorious, and the last should not be avoided, if it can be sustained on any reasonable theory. It is held in the Miller Case that where the invention in the two patents is the same, and the second one contains claims broader than the first, it is nevertheless invalid, but where it covers matter essentially distinct and separate from the first, and its claims, it may be sustained if it distinctly appears that the later invention is a separate one, "distinctly different and independent from that covered by the first patent." In that suit a spring with two functions was in question, and the first patent covered the spring, and, of course, all its functions, known and unknown. The second patent was for one of these functions. The first covered both a lifting and depressing operation; the second, only the lifting effect. It was also decided in the same case that a single invention may include both a machine and its product, and that an inventor may make an improvement on his own invention, and obtain a separate patent thereon. Cantrell v. Wallick, 117 U. S. 689, 6 Sup. Ct. 970, 29 L. Ed. 1017.

This question of double patenting is discussed at length in the testimony and briefs. There are numerous differences of detail between the arrangements of the two mechanisms. Two motors are used in the railway system, which are series motors, while only shunt wound motors can be used in elevator systems. For this reason the exact controlling devices of the elevator patent could not be used in the other. Another problem distinct in the two systems is the "coast relay" in the railway system, and the "overhaul" in the other. When the car is going down hill, current can be cut off the motor by a series of coast relay switches. In the elevator design, when the car is going up light or down heavily loaded, the motor becomes a generator and tends to induce a dangerous speed. This is called the "overhaul," and is provided for in a different way from that of the coast relay. In brief, the main motors in the railway system may be stopped by the coast relays, and started again by the operator, without restoring the controller to its initial position, as must be done in the elevator system.

There is also a difference between the controller of the elevator patent, and the current varying controller of the railway patent. The latter performs an additional function in shifting the two motors from series to parallel. Both are current varying controllers, however, and operate in just the same way, except for such additional function of the railway device. It is true that there is a distinction between the current varying controller of the railway patent and the controller mechanism of the elevator patent, in that the first does all that the second does, and other things also. It is here assumed that the railway system would not work satisfactorily with one motor, or with a shunt wound motor, and that the elevator system would not work with a series motor. The differences in the two systems are

largely due to these facts. There are other differences in operation, because the results are different; the controller mechanism being applied to different machinery.

A test suggested in the Miller Case is whether the structure of the second patent would infringe a claim of the first. In this case it is quite clear that the elevator mechanism would not infringe the railway patent if the patents were in different ownership, because its operation and result are distinct. It·seems, also, that defendant does not infringe the railway patent, for the same reason.

[4] If the elevator patent may properly be considered as an improvement upon the other, it should be sustained, although including the same invention. Miller v. Eagle Mfg. Co., supra; Cantrell v. Wallick, supra; Thomson-Houston El. Co. v. Ohio Brass Co., 80 Fed. 712, 26 C. C. A. 107. The second patent makes use of a shunt wound motor, a distinct improvement as applied to an elevator system. The same is true of the armature shunt resistance. Another problem had to be met, and such changes in the railway mechanism as were necessary to solve it were made. The field resistance which is cut in for high speed in the elevator wiring is, of course, absent in the railway patent, because of the use of series motors. It seems clear that these changes, made necessary in a practical elevator system, are improvements on the railway system, and that Sprague was entitled to both patents.

Claims 9 and 10 are held valid and infringed. Claim 1 is valid, but not infringed. Decree for plaintiffs accordingly, each party to pay their own costs.