**CROWDER et al. v. ARMOUR et al.**
**No. 6755.**
Circuit Court of Appeals, Seventh Circuit.
June 24, 1939.

A. Trevor Jones, of Chicago, Ill., for appellants.

Sidney Neuman and Carl Marx, both of Chicago, Ill., for appellees.

Before EVANS, SPARKS, and KERNER, Circuit Judges.

SPARKS, Circuit Judge.

Appellants charged appellees with infringement of United States patents to Crowder numbered 1,820,867 and 1,963,778. The beneficial interest and exclusive license under these patents is in Para-Tone Co., Inc. The former patent was issued August 25, 1931, on an application filed May 24, 1929, and the latter was issued June 19, 1934, on an application filed June 1, 1931. The bill further alleged unfair competition, and demanded injunctive relief and an accounting for damages and profits. The defenses were invalidity and non-infringement, and the general issue as to unfair competition. The cause was referred to a master who found that the first patent was neither valid nor infringed; that the second patent was infringed, but that it was invalid; and that there was no proof of unfair competition. The court overruled appellants' exceptions to the mas-

ter's report, approved it, adopted his findings and conclusions as its own, and without opinion dismissed the bill for want of equity. From that decree this appeal is prosecuted.

Both patents relate to a transfer sheet adapted to be used by artists, engravers and the like, for reproducing backgrounds or shadings for original sketches or the like. Until otherwise stated, our discussion relates to the first patent. Its objects were to provide a sheet which does not need a frame or other means for supporting it normally out of contact with a drawing upon which the sheet or background is to be placed; to provide a transfer sheet which is flexible and so constructed and arranged that the flexing of the sheet will in no way injure its usefulness; to make a transfer sheet which may be kept indefinitely without impairing its usefulness, by the use of materials which will not harden by long standing but will always retain their pliability; to provide a transfer sheet which will transfer the shading or background bodily to the sheet upon which it is desired to be placed so that no trace of the background or shading remains on the transfer sheet; and to provide a transfer sheet which will permit the removal of any desired portion of the sheet or background, in order to reduce high lights in the shading or background, or to enable one to remove undesired portions of the shading which have been transferred to the second sheet. A further object of the invention is the provision of a process for making such transfer sheet.

Claim 15 of this patent is relied upon.[1] The method therein described is substantially as follows: A sheet of tissue paper is moistened and placed on a smooth surface such as a japanned surface or a polished aluminum plate. A squeegee is then run over the surface of the paper to press out any air or surplus of moisture from beneath the sheet so that it will lie perfectly flat. Before it is permitted to dry, a layer of glue is placed on the upper surface of the sheet by a brush or any other suitable means. The glue found most desirable by the patentee consists of a mixture of glycerine, gum arabic and soft soap in the proportions respectively, by weight, of 30, 35 and 35, to which is added

sufficient distilled water to reduce the glue to the desired consistency. The glue is to be spread upon the surface of the tissue paper in a very thin coat or film. By placing it on the damp paper the glue penetrates it and forms a bond between the paper and the glue. The paper and glue are permitted to dry for about an hour, or longer if necessary, and it is then ready to receive the ink which is to provide the shading or background for the transfer sheet. This type of glue does not dry as a hard layer, but remains soft and yielding so that when the sheet of paper is flexed the glue will not crack, and any small amount of tension produced in the layer of glue will be taken care of by its yielding qualities.

In order to protect the printed surface, as well as the glue, the entire surfaces of the glue and ink are coated with a compound, in equal parts by weight, of bleached beeswax and paraffin. These two elements are melted together and mixed so as to produce a liquid of uniform consistency. To apply this compound it is placed in a suitable container, preferably one which has means for keeping the liquid at the desired temperature. The paper with the coating of glue is then held with the coated surface toward the surface of the liquid in the container and it is moved toward the liquid until it rests on the surface thereof with the upper surface of the sheet out of contact with the liquid. The sheet may thus be floated on the surface of the liquid, and it has been found that about all that is necessary is to draw the sheet along the surface of the liquid for a short distance and then lift the sheet with the coating of wax and paraffin thereon. The coating of wax and paraffin cools almost instantaneously after its removal, and the sheet is then ready for use. This sheet will be hereinafter referred to as the transfer sheet as distinguished from the sheet which contains the artist's drawing upon which the background or shading is desired to be imposed by the subsequent photographic process.

The transfer sheet is to be used in the following manner: It is placed upon the drawing sheet with the coated surface against the drawing sheet in such a position as to cover the area which is to be

---

[1] "15. The method of forming transfer sheets which comprises the steps of superimposing a series of markings to be bodily transferred to a given surface upon a supporting layer of relatively thin, transparent material and covering said markings with a protecting layer of wax, which wax also acts as a vehicle for transferring the markings bodily onto a given surface."

shaded. Pressure is applied to the back of the transfer sheet by means of some hard, smooth surface such as a piece of bone, spoon or the like, which is pressed against the back of the transfer sheet and over the entire area to which it is desired that the shading be applied. If after the back of the transfer sheet has thus been pressed, the transfer sheet is lifted from the drawing sheet, the tissue paper will carry with it the layer of glue, the shading, and also the waxed surface away from the drawing sheet and leave the transfer sheet the same as it was before it was first applied to the drawing sheet, so that in case it were discovered that the wrong type of shading had been applied it could be removed again and the desired type of shading applied thereto without injury to either the drawing or the transfer sheet.

In order to cause the shading or background to remain on the drawing sheet, it is necessary, after pressure is applied with the bone, to moisten the back of the tissue paper so that the moisture will soak through the glue, causing the glue to be dissolved and loosened from the surface of the tissue paper. After thus moistening the tissue paper, it is permitted to stand for about fifteen seconds to entirely free the tissue paper. Thereafter the tissue paper is lifted and it will be found that the coating defined by the pressed area will remain on the surface of the drawing sheet and will come entirely free from the tissue paper. Thus it will be seen that the entire amount of shading which has been printed on the burnished area is removed from the tissue paper so that the shading or background on the drawing sheet will be of uniform weight, due to the fact that the entire printed surface of the pressed area has been removed from the tissue paper. After the tissue paper has been removed, the surface of the drawing sheet within the pressed area is coated with a layer of beeswax and paraffin on top of which is the printed background or shading, and the vestiges of glue which remain after the removal of the tissue paper.

Since there is a layer of wax and paraffin between the printed background or shading and the surface of the drawing sheet, it is easy to remove any undesired portion of the shading or background from the surface of the drawing sheet by merely scraping it from the surface of the drawing sheet with a knife or any other suitable device.

In former devices of this character, it was necessary that the transfer of the shading be made by an artist or skilled craftsman, since care had to be exercised that only the surface upon which the shading was to appear be pressed down. This was necessary since the printing was carried on the outer surface of the transfer sheet, and when the transfer sheet was pressed down from the back, the ink itself came in contact with the surface of the drawing sheet, and it was quite difficult thereafter to remove any excess shading without injuring the drawing sheet.

By the disclosure of this patent the ink never comes in contact with the drawing sheet because it is protected by the coating of paraffin and beeswax which lies between the drawing sheet and the ink. It must therefore be borne in mind that when we speak of the transfer sheet it does not mean that the ink is transferred from the glue-coated tissue paper to the picture or to the drawing sheet, but the transfer is from the tissue paper to the coating of paraffin and wax. It is quite true that both the ink and wax coating are in a certain sense transferred to the picture or drawing sheet, yet the ink never comes in contact with the drawing sheet or picture. The ultimate object thus sought to be accomplished, of shading a drawing, is not with respect to the original drawing sheet or picture. The ultimate object is produced through the art of photography which makes a picture of the original drawing or photograph with the desired shadings imposed thereon as described above. The shading is never directly or permanently applied to the original drawing, but is merely attached to it for photographic purposes by the wax coating. The photograph is the ultimate desired product. The wax coating being transparent, the photograph shows nothing but the drawing with the shading or background.

[1] The District Court thought that the disclosures of this patent were anticipated by the prior art and amounted at most to nothing more than mechanical skill. The practice and desirability of shading original drawings for photographic purposes is very old in this particular art. As early as 1879, Day in his patent No. 214,493, disclosed a means of doing this by superimposing over the line drawing a transparent silk screen held by a rectangular frame. The under side of this screen was printed with a pattern of dots by means of smudging ink. A cutout of the drawing was

first placed between the drawing and the screen to protect the parts of the drawing upon which it was not desired to have the pattern appear, then with a hard instrument the upper surface of the silk screen was rubbed and pressed down upon the exposed portion of the drawing. By this means some of the ink was smudged off the under side of the silk screen on to the drawing to produce the dots on the drawing, after which the drawing was photographed and the dots appeared in the photograph as a part thereof.

This method was employed quite generally down to the disclosure of the patents in suit. It was objectionable because of the necessity of preparing the cutouts, or friskets, which protected the parts of the drawing from the shading. Other objections were that the dots were not removable and were not reproduced evenly, and the artist was thus prevented from experimenting with different patterns or screens in order to get the best esthetic effect.

Other prior patents disclosed the use of a transparent celluloid plate which could be fastened over the drawing by rubber cement or thumb tacks. This celluloid had dots or other screen patterns printed on its upper surface, and by means of a hard instrument these dots could be scraped off in places where they were not desired. Objections to this method were that the celluloid was expensive and cumbersome; that it did not carry its own fastening means, and that on account of its thickness, the dots or markings were spaced too far from the surface of the drawing for good photographic reproduction.

Bliss No. 1,772,927, disclosed a prior method of spreading the surface of the drawing with a fluid rubber cement upon which was placed a sheet of tissue paper or other transparent material carrying the printed dots or pattern. This was thought to be objectionable because the screen did not carry its own adhesive and the rubber cement was messy, difficult to handle, and could not be spread uniformly so as to produce the best photographic results. It should be noted further that when the cement hardened ready removability was not possible.

Crowder was familiar with all these methods and he had constantly experimented with them since the year 1914 for the purpose of producing a more satisfactory method, less cumbersome and more facile and efficient. He makes no claim that the use of wax was new with him or that his invention consists of spreading wax to form a layer, but he does claim as new his use of a layer of wax to function not only as an adhesive but also as a protecting layer to cover the printed dots and insulate them from the drawing. We find nothing in the prior art which discloses the concept of his uniform layer of wax-carrying dots as a screen to be photographed through as disclosed in his patents.

Appellees urge that there is nothing in this patent that indicated its use with respect to the art of photography. It is true that the word photograph or any of its derivative words are not mentioned, but the words "artists, engravers and the like" are used to sufficiently designate the art of photography. Moreover, the products of all the parties here concerned are used exclusively in the art of photography and that is the reason that transparent elements are used in them.

The District Court was of the opinion that this patent was anticipated by the following prior art: Parke, No. 124,616; Palm and Fechteler, No. 209,952; Bertling, No. 373,331; DeGrousilliers, No. 504,835; Gribble, No. 861,025; Knowles, No. 1,143,-407; Swaim, No. 1,721,933; and Bliss, No. 1,772,927.

Parke disclosed a method for ornamenting wood, metal, and the like. It was in no way related to the art of photography and there was no suggestion of a wax layer for adhesion or protection. Palm and Fechteler related to decalcomania pictures, which was a process of transferring prints from paper to glass, porcelain, and the like, and the decoration of glassware by gumming pictures upon it. It was in no way related to photography. He made no use of a wax layer but used varnish instead. Bertling's disclosure related to the preparation of a lithographic stone by sprinkling upon it a powder composed of spermaceti, sperm-oil and finely powdered charcoal. There was no transparency involved and it was intended to be heated in order to perform its function. DeGrousilliers was likewise a decalcomania disclosure. It was not related to the art of photography and there was no suggestion of a wax coating.

Gribble disclosed a method of preparing designs, figures, pictures, and the like, on decorative paper ornaments, and trans-

ferring them to ceilings, friezes, walls, or any other surface without soiling the ground which could be either water-color, wallpaper, oil, canvas, silk, or any other material, and the ornaments would be without gloss, and if properly executed would look like good, artistic handpainted decorations. It had no relation to the art of photography, and was permanently fastened to the original design. It made no reference whatever to a wax layer to be used either as an adhesive or a protection. Knowles suggested no wax layer or its equivalent, either as an adhesive or protection to the shading. It was fastened either by thumb screws or rubber cement. Swaim referred to the art of decalcomania. His patent did not disclose an easily removable wax layer or its equivalent, and the transfer of the printing was caused by the application of heat. It was in no way connected with the art of photography. Bliss disclosed a method of "dressing picture surfaces with technique." No wax layer was suggested for any purpose and the pattern was permanently applied to the original drawing by rubber cement.

Most of these references are not properly classified as analogous art and we think none of them can be properly said to anticipate the disclosures of this patent. It is quite true that Crowder disclosed no new elements, but we are convinced that by the use of old elements he produced an old result in a more facile, economical and efficient way. The record in this case supports this conclusion. Not only did the disclosure receive much favorable comment, both in America and in England, but it has been extensively used in the practice of the art and has achieved commercial success. In addition, the similar disclosures of the United States patent No. 1,905,061 to the appellee, Harry Sax, confirms our conclusions in this respect. Moreover, the presumption of validity which attaches to the patent in suit adds no little weight to our conclusion, and we think the patent is valid.

We are unable to agree with the District Court that the disclosures were merely the result of mechanical skill. It is true that it would seem so at this late date, but we must look at it from the standpoint of the mechanic before the disclosures were made. Conceding that all of the elements were old and that their combination was simple and perhaps should have been recognized long ago, yet the fact remains that no mechanic or practitioner of the art of photography ever disclosed its possibility until this patent appeared. The need of such combination and its use was obvious as early as 1879, and yet no mechanic or anyone skilled in the photographic art ever suggested the combination which Crowder disclosed fifty-two years thereafter. Many may have realized the necessity but no one suggested the solution, simple as it was. This seems to us to establish the conclusion that Crowder's disclosure was not the result of mere mechanical skill. It seems never to have occurred to appellee, Sax, until almost two years after Crowder had filed his application for this patent.

Under the second patent claims 7 and 8 are relied upon.[2] The objects of this

---

[2] "7. In a transfer adapted to provide an artist's background, the combination with a drawing surface to be covered, of a layer of slightly adhesive material adhered to a predetermined area of said surface by the application of pressure but readily removable therefrom without marring the surface, a superimposed continuous layer of transparent flexible material of greater tensile strength than the adhesive material substantially co-terminous with said area and adhered to said surface through the intermediation of the adhesive material, and markings of ink or the like between said layers in direct contact with each layer and protected by both layers, said transfer being thereby rendered substantially integral with said surface and said markings being visible thereon through the layer of transparent material.

"8. In a transfer adapted to provide an artist's background, the combination with a drawing surface to be covered, of a layer of solidified wax adhered to a predetermined area of said surface by the application of pressure but readily removable therefrom without marring the surface, a superimposed continuous layer of transparent flexible material of greater tensile strength than the solidified wax substantially co-terminous with said area and adhered to said surface through the intermediation of the solidified wax, and markings of ink or the like between said layers in direct contact with the wax and protected by both layers, said transfer being thereby rendered substantially integral with said surface and said markings being visible thereon through the layer of transparent material."

patent are substantially the same as those of the first. It is merely an improvement over the method and means of accomplishing the same general result. The only difference in making the products of both patents is that under the second patent a layer of glassine, lacquer, or other transparent flexible material, is placed over the coating of glue which covers the tissue paper. Then the markings are printed upon the glassine, or other similar material used, and they in turn are covered by the layer of wax. In the use of both products the tissue paper and the glue coating are removed, thus leaving the printed dots or marks exposed under the first patent, and under the second patent they are covered and protected ·by the layer of glassine, or other such material, thus forming a sandwich consisting of glassine, markings, and wax. What we have said with respect to the validity of the first patent we think applies to the validity of the second patent.

It is contended by appellees, however, that the granting of the second patent constituted "double patenting" with respect to the first patent, and that it claims an obvious use of the idea patented in the first patent. We think this contention cannot prevail under the rulings in MacGregor Co. v. Vaco Grip Co., 6 Cir., 2 F.2d 655; In re Carlton, Cust. & Pat.App., 77 F.2d 363; and Deister Concentrator Co. v. Deister Machine Co., 7 Cir., 263 F. 706.

It is further contended by appellees that the disclosures of the second patent were anticipated by the prior art, and as a part of that prior art they cite the first patent which was co-pending at the time the second application was filed. Under the decisions of Barbed Wire Patent Cases, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154; Shipp v. Scott School Township, 7 Cir., 54 F.2d 1019; and Century Electric Co. v. Westinghouse Co., 8 Cir., 191 F. 350, we think the first patent should not have been construed as anticipatory prior art, but of course it was properly considered as evidence on the question of double patenting. The other prior art relied upon is described in our discussion with relation to the first patent, and for reasons there stated we think it is not applicable to this patent, and that its disclosures constituted more than mere mechanical skill. Both patents come to us with the presumption of validity, and we think that presumption has not been overcome by the disclosures of this record.

The next question presented is whether appellees' product and process infringe either or both of the patents in suit. As early as July, 1928, Crowder conceived what is referred to as his "Para-Tone" sheets. In February, 1929, he placed them on the market, and on May 24, 1929, he filed his application for the first patent, under which they were made. We have described the "Para-Tone" sheets in our discussion of the first patent. Appellee Siebert was employed by Crowder in this work in 1928. He was engaged continuously under supervision of appellant in the making of these sheets until February, 1931, at which time he left appellant's employ and became associated with appellees. On February 11, 1931, appellee Harry Sax filed his application for United States patent No. 1,905,061, which related to the art of shading or toning drawings and to an article employed for that purpose, as well as to methods of making the article. His object, method and product were substantially the same as appellant's "Para-Tone" sheet. The only difference was that Sax placed a lacquer layer between the printed markings and the wax layer. The result was that when the transparent paper with the glue coating was removed, the printed markings were exposed just as they were in the use of the "Para-Tone" sheet. The only difference was that whereas appellant disclosed a layer of wax to which were attached the exposed markings, Sax placed a layer of lacquer between the markings and the wax, and his markings were attached to the lacquer which in turn was attached to the wax. It is not apparent that the layer of lacquer in Sax's disclosure was of any benefit to the product. Indeed, the objects sought and the results obtained were precisely the same in both the first Crowder patent and the Sax patent. This conclusion we think is conclusively supported by the fact that Sax shortly afterwards abandoned the use of the lacquer layer between the markings and the wax.

Early in 1931, appellant produced a second sheet which he called "Comptone" in which, after the screen was laid on the drawing, the dots or other printed markings were not only protected from below by a layer of wax, but also from above by a layer of lacquer. Subsequently, appellees abandoned their "first Screnetone" sheet, as hereinbefore described, and introduced what is known as their "second Screnetone" sheet in which they placed the print-

ed markings between the lacquer layer and the wax sheet, just as was done in appellant's "Comptone." Later in the summer appellant produced what he refers to as his "Improved Stack Sheet" or "Stack Screen," in which he continued to employ both the ideas disclosed in his basic patent in suit. The only difference between appellant's "Comptone" sheet and the "Stack Screen" is that appellant replaced the layer of lacquer by a sheet of transparent glassine paper for greater strength. This thought was suggested by his second patent in suit. Subsequently, in May, 1933, appellees first made what they called their "cutaway" sheet which seems to embody the glassine-dot-wax sandwich precisely as does appellant's "Stack Screen." The District Court found that appellees' second "Screnetone" sheet infringed appellant's "Stack Screen," and there seems to be no question raised in the record as to that ruling. A study of this record convinces us that appellees have infringed both patents.

Appellees contend that the record does not disclose the process by which their product is made, and that inasmuch as claim 15 of the first patent is a method or process claim, it can not be held to be infringed solely by appellees' completed product. It is sufficient to say that the record does disclose the methods employed by appellees in all the products they have produced and we are convinced they infringe the claims as heretofore set forth.

Appellees further contend that their product does not infringe claims 7 and 8 of the second patent, because these claims are in combination with the drawing surface to be covered. A fair reading of these claims convinces us that the drawing surface therein mentioned should not be construed as a part of the combination claimed, but that the combination thereafter described is designed to be used in connection with the drawing surface to be covered. The language is perhaps not as clear in this respect as it might have been if a comma had been placed after the word combination. This would indicate that the real combination claimed was designed to be used with the drawing surface to be covered and it would correctly describe the intention of the appellants as well as that of the appellees in the fabrication and the use of their products. We have thus construed claims 7 and 8 and we think such construction does no violence to either the claims or the parties.

Appellants have withdrawn their request for an accounting, but they ask that an injunction issue enjoining appellees from making, using or selling their "Screnetone" and "Cutaway" sheets and from otherwise infringing the patents in suit. A perusal of this record convinces us that appellants are entitled to this relief.

The decree of the District Court is therefore reversed and the cause is remanded for further proceedings not inconsistent with this opinion.